CORAL GABLES IMPORTED
MOTORCARS, INC., et al.,
Plaintiffs-Appellees,

v.

FIAT MOTORS OF NORTH AMERICA,
INC., Defendant-Appellant.

No. 80–5787.

United States Court of Appeals,
Eleventh Circuit.

April 23, 1982.

Greenbaum, Wolff & Ernst, James M. Brachman, New York City, Woodrow M. Melvin, Miami, Fla., for defendant-appellant.

Lane, Mitchell & Harris, P.A., C. Robert Murray, Miami, Fla., for Coral Gables Imported Motor Cars, Inc. and Rebhan.

Before TUTTLE, KRAVITCH and JOHNSON, Circuit Judges.

TUTTLE, Circuit Judge:

This diversity case involves various tort and contract claims arising from certain representations and promises made by appellant Fiat Motors of North America, Inc. (Fiat Motors) to appellees Coral Gables Imported Motorcars, Inc. and Charles Rebhan in connection with the execution of a Fiat franchise agreement. After trial by jury, the district court entered judgments against Fiat Motors in the total amount of $591,828.00. On appeal Fiat Motors raises numerous claims of error. Finding one of these claims to be dispositive, we reverse for the reasons which follow.

## I. FACTS

In 1974 Fiat Motors had two dealer franchisees in Dade County, Florida. One of these dealerships was located in Coral Gables (central Dade County) and the other was located in Miami (north Dade County). Dissatisfied with these relationships, Fiat

Motors terminated its franchises in early 1975 and appointed two new dealers, Hebert Oldsmobile in Homestead (south Dade County) and Autorico, Inc. in Miami. Apparently Fiat Motors was interested in establishing a third franchisee in central Dade County. And Rebhan, the owner of one of the most successful Dodge dealerships in the United States, was interested in acquiring a Fiat franchise for the Coral Gables area. In April of 1975, Fiat Motors and Rebhan began negotiations for a franchise agreement. At this time Rebhan, who later incorporated under the name of Coral Gables Imported Motorcars, Inc. (Gables), had an oral commitment to lease land in the Coral Gables area. During the negotiations, Fiat Motors characterized the proposed new franchise as a "replacement" for the central Dade County franchise which it had terminated earlier that year. More significantly on May 1, 1975, after being advised by the Florida Department of Highway Safety and Motor Vehicles (Department) that it would not entertain protests regarding Gables' appointment, Fiat Motors informed Gables that its status as a "replacement dealer" had been cleared through the Department.[1]

In the context of Florida's statutory procedure for licensing motor vehicle dealers, the designation "replacement dealer" has special meaning. Section 320.642 provides:

> The department shall deny an application for a motor vehicle dealer license in any community or territory where the licensee's presently licensed franchised motor vehicle dealer or dealers have complied with licensee's agreements and are providing adequate representation in the community or territory for such licensee. The burden of proof in showing inadequate representation shall be on the licensee.

Fla.Stat. § 320.642 (1979). In implementing this statutory provision, the Department has promulgated Rule 15C–1.08 which affords currently licensed dealers an opportunity to protest the issuance of a new license. This Rule also provides that the Department may convene a hearing if necessary to determine whether the application for a license should be granted or denied according to the criteria set forth in section 320.642. In the case of an application by a "replacement dealer," however, the Department apparently often finds it unnecessary to entertain protests since no additional competition will arise by virtue of a new licensee's replacement of a former dealer. In this situation, a licensing decision can be made without the substantial delays which otherwise result from the hearing process.

On May 14, 1975, Gables, allegedly relying on Fiat Motors' representation that it would be treated as a replacement dealer by the Department, executed an application for a franchise agreement. This agreement became effective on June 13, 1975. By letter of June 25, 1975, Fiat Motors formally advised the Department that it was appointing Gables as a replacement dealer for its former central Dade County franchise. On June 27, 1975, Rebhan executed a ten year lease agreement for the Coral Gables premises. He then began hiring and training salesmen, mechanics and other employees. No Fiat cars or parts could be shipped to Gables, however, until its license was granted. On July 11, 1975, the Department notified the other Fiat dealerships in Dade County of their right to protest Gables' application. Thereafter Hebert Oldsmobile and Autorico, Inc. filed protests against the appointment of Gables as a Fiat dealer. The same state official who had previously informed Fiat Motors that protests would not be entertained then convened a hearing with respect to Gables' license application.

When Rebhan first learned about the protests in July of 1975, he contacted Dewey Manning, President of Fiat Motors. Rebhan alleged that during this conversation,

---

1. It is apparent, however, that both Fiat Motors and Gables were aware of the existence of the other two Fiat dealerships in Dade County. Moreover, Fiat Motors asserts that one of Rebhan's employees had a similar conversation with a Department representative, but that Gables made no attempt to confirm his "replacement" dealer status with the Director of the Department.

Manning agreed to pay Gables $10,000 for a grand opening, to defer the payments for parts, and to take care of any losses Gables might have in operating the dealership until the Fiats arrived. Rebhan asserted that in reliance on these promises, he made every effort to keep the dealership open by selling used cars and Lancias, for which a license had been issued without protest. Although Fiat Motors contested the provisions of this oral contract at trial, it did admit to returning Gables' initial payment for its Fiat parts pending the licensing determination. Moreover, by letter dated September 5, 1975, Fiat Motors agreed to contribute $30,000 towards Gables' rental payments. Rebhan responded to this letter on September 16, 1975, by asserting that he thought other financial arrangements had been made. Fiat Motors subsequently forwarded two checks totaling $30,000 to Gables in September and October of 1975. The letter enclosing the second check stated: "This completes the program as outlined in previous correspondence." Both of these checks were endorsed by Gables under written protest and applied to Gables' rent account.

On October 24, 1975, the Department entered an order granting Gables' license as a Fiat dealer.[2] After the license was awarded, Gables began receiving Fiat cars and parts. By letter of October 28, 1975, Fiat Motors requested an immediate $15,000 payment on the parts with the remainder to be paid in $15,000 monthly installments. In forwarding his initial $15,000 payment, Rebhan indicated that he thought they had agreed to a much slower payback. Apparently no other conversations concerning Fiat Motors' alleged promises occurred during the next two months.

Gables' franchise agreement expired by its terms on December 31, 1975. On December 18, 1975, Gables executed a second franchise agreement which contained a release provision. Although Gables had been selling Fiats for several months, it continued to suffer financial losses through July

of 1976 when the franchise was terminated. In March of 1976, Gables and Rebhan sued Fiat Motors alleging fraud, breach of an oral contract, promissory estoppel and negligence. Fiat Motors' motion for summary judgment was denied and the case proceeded to trial. The district court also denied Fiat Motors' motion for directed verdict and charged the jury on each of the four claims presented by Gables and Rebhan. The jury entered a general verdict in favor of Gables and Rebhan awarding them $425,000 as compensatory damages and $166,828 in punitive damages. The district court denied Fiat Motors' motion for judgment notwithstanding the verdict. Fiat Motors then brought this appeal raising numerous claims of error.

## II. RELEASE AND WAIVER

The second franchise agreement executed by the parties in December of 1975 contained the following release:

SIXTH: This Agreement terminates and supersedes all prior written or oral agreements, if any, between FDI and Dealer, and between Dealer and any former distributor of Fiat passenger cars, parts and products, relating to the subject matter hereof, except with respect to any trade indebtedness which may be owing to either FDI or Dealer to the other, and except that this Agreement shall not operate to cancel any of Dealer's unfilled orders with FDI for any Fiat passenger cars, parts and products placed with FDI pursuant to the provisions of any sales agreement terminated or superseded by this Agreement. Except as herein otherwise provided, upon execution of this Agreement and in consideration of the execution thereof by FDI, Dealer releases FDI from any and all claims, demands, contracts, and liabilities (including statutory liabilities) of any kind or nature whatsoever, arising from or out of or in connection with any such prior agreements.

---

2. In its order, the Department found that both Fiat Motors and Gables had acted under the belief that Gables would in fact be no more than a replacement dealer for the former Dade County franchise. It further found that the criteria for denying a license in section 320.642 had not been established.

Fiat Motors submits that this release should be construed as a matter of law to extinguish all of the claims raised by Gables and Rebhan. Thus it asserts that the trial court erred in submitting the case to the jury. On the other hand, Gables and Rebhan contend that the release was ineffective because of the alleged continuing fraud surrounding the execution of the second agreement and because the agreement was executed under duress.

▪▪▪ Although the laws concerning the construction of a general release are more or less uniform among the states, we must begin our analysis of this agreement by focusing on the appropriate state law to be applied. The agreement itself provides that it is to be "governed by, and construed according to the laws of New York." In order to determine whether this choice of law provision is to be given effect, we look to the substantive laws, including the conflict of law rules, of the forum state, Florida. *E.g., Klaxton v. Stenor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Charles L. Bowman & Co. v. Erwin*, 468 F.2d 1293 (5th Cir. 1972). The parties' agreement as to which law shall govern the construction of a contract would be recognized under Florida law, unless the chosen law contravenes the public policy of Florida. *See, e.g., Wilkinson v. Manpower, Inc.*, 531 F.2d 712 (5th Cir. 1976); *Hirsch v. Hirsch*, 309 So.2d 47 (Fla. App.1975); *Davis v. Ebsco Industries, Inc.*, 150 So.2d 460 (Fla.App.1963); *cf. Boat Town U.S.A., Inc. v. Mercury Marine Division of Brunswick Corp.*, 364 So.2d 15 (Fla. App.1978) (drawing a distinction between clauses which provide that contracts are to be interpreted according to, rather than governed by, the laws of another state).

Since New York law concerning the scope and effect of general releases does not contravene any articulated public policy of Florida, we find that New York law should be applied to this franchise agreement.[3]

▪▪▪ Under New York the law construction of a general release is governed by principles of contract law and thus the intention of the parties is the controlling issue. *E.g., Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261 (2d Cir. 1965) (applying New York law); *Mangini v. McClurg*, 24 N.Y.2d 556, 249 N.E.2d 386, 301 N.Y.S.2d 508 (1969); *Mt. Read Terminal, Inc. v. LeChase Construction Corp.*, 58 A.D.2d 1034, 396 N.Y.S.2d 959 (1977). The scope of the release must of course be determined in the context of the particular controversy at issue.[4] Where the language of the general release is unmistakenly clear, however, the intent of the parties can often be discerned from the release itself. *E.g., In re Schaefer*, 18 N.Y.2d 314, 221 N.E.2d 538, 274 N.Y.S.2d 869 (1966); *Single v. Whitmore*, 307 N.Y. 575, 122 N.E.2d 918 (N.Y.1954); *Powell v. Oman Construction Co.*, 25 A.D.2d 566, 267 N.Y.S.2d 862 (App.Div.1966). Thus, unless fraud, duress or illegality is established, the language of a voluntary release will be given its full effect. *See Korn v. Franchard Corp.*, 388 F.Supp. 1326, 1328 n.3 (S.D.N.Y.1975); *Mangini v. McClurg, supra.*

▪▪▪ Subject to certain specified exceptions, the release provision in the instant case terminates all prior written or oral agreements which relate to the subject matter of the franchise. It then releases Fiat Motors from "any and all claims, demands, contracts, and liabilities ... arising from or out of or in connection with any such prior agreements." It cannot seriously be disput-

3. The appellees assert that Fiat Motors' failure to comply with Rule 44.1 of the Federal Rules of Civil Procedure precludes the application of New York law to this release. By its own terms, Rule 44.1 requires only that notice be given concerning the "law of a foreign country." Fed.Rules Civ.Proc. 44.1. Moreover, Fiat Motors relied on New York law in its original motion for summary judgment. Finally, we note that a federal court sitting in diversity is required to take judicial notice of the laws of every state. *See McCormick on Evidence* § 335 (2d ed. 1972).

4. Under New York law, a general release may be raised as a defense to claims for both tort and contract liability. *See, e.g., Krichmar v. Krichmar*, 42 N.Y.2d 858, 366 N.E.2d 863, 397 N.Y.S.2d 775 (1977); *Mt. Read Terminal, Inc. v. LeChase Constr. Corp.*, 58 A.D.2d 1034, 396 N.E.2d 959 (1977).

ed that the representations and promises allegedly made by Fiat Motors are related to the subject matter covered by this comprehensive franchise agreement.[5] Moreover, the record clearly indicates that all of the claims raised in this suit relate to the various oral and written agreements made in the summer of 1975, several months prior to the execution of the second franchise agreement which contained the release provision. If the appellees had intended to reserve any of their claims against Fiat Motors, they should have added words of reservation. *In re Schaefer, supra.* Thus, when the particular language of the release is viewed in the context of the franchise relationship between the parties, we find that the release was sufficient to bar all of the appellees' claims.

The appellees contend, however, that they should be allowed to rescind the second franchise agreement because of the alleged continuing fraud perpetrated upon them at the time the agreement was executed. No independent fraudulent activities on the part of Fiat Motors are alleged to have occurred in December of 1975 when the agreement was executed. Rather, appellees base their claim of "continuing fraud" on the representations and promises made by Fiat Motors during the summer of 1975. Appellees assert that since they did not realize the intentional nature of Fiat Motors' fraudulent conduct until March of 1976, their claims could not have effectively been released in December of 1975. It is clear, however, that the appellees must have been aware of the alleged misrepresentations concerning Gables' "replacement" status in July of 1975 when the protests were lodged. Indeed, Rebhan admitted as much in his testimony at trial. It is equally obvious that appellees could not have been reasonably relying upon Fiat Mo-

tors' alleged promises several months after the license was awarded when Fiat Motors had unequivocally indicated that its $30,000 payment was in full satisfaction of its promises and had imposed a specific schedule for monthly payments on parts thereafter.[6] In the absence of any allegation that Fiat Motors either renewed its old promises or made new ones at the time the second agreement was executed, we find no basis for appellees' claim that the release was tainted by continuing fraud.

Similarly, we are unable to conclude that the franchise agreement was the product of duress. Under New York law, a release is not voidable on grounds of economic duress unless it is shown that a threat was unlawfully made, causing an involuntary acceptance of the contract terms under circumstances where no alternative was available. Mere hard bargaining positions or the pressure of financial circumstances is not sufficient. *See, e.g., Gulf & Western Corp. v. Craftique Productions, Inc.,* 523 F.Supp. 603 (S.D.N.Y.1981); *Business Incentives Co., Inc. v. Sony Corp. of America,* 397 F.Supp. 63 (S.D.N.Y.1975); *Stewart M. Muller Construction Co. v. New York Telephone Co.,* 40 N.Y.2d 955, 359 N.E.2d 328, 390 N.Y.S.2d 817 (1976). In the instant case, it was apparent to both parties from the time the original agreement was executed, that a renewal agreement would be forthcoming in December of 1975. While it is true that appellees would have been unable to continue receiving cars and parts if they had not signed the second agreement, this sort of allegation alone has uniformly been held insufficient to establish duress. *See, e.g., Three Rivers Motors Co. v. Ford Motor Co.,* 522 F.2d 885 (3d Cir. 1975); *Kohen v. H.S. Crocker Co.,* 260 F.2d 790 (5th Cir. 1958); *La Beach v. Beatrice Foods Co.,* 461 F.Supp. 152 (S.D.N.Y.1978).

**5.** We note that the franchise agreement specifically covers advertising costs, payment schedules for parts, and releases Fiat Motors from any liability for expenditures incurred by the dealer in the performance of its contractual obligations.

**6.** Rebhan's testimony that he was unaware of the intentional nature of Fiat Motors' misrepresentation until March of 1976 is both contradictory and self-serving. Moreover, we find this testimony to be irrelevant under circumstances where promises were made and disavowed several months prior to the execution of the release.

66 *Am.Jur.2d, Release* § 26 (1973). To hold otherwise would be tantamount to finding that the mere renewal of a franchise agreement, under circumstances where a potential dispute between the parties exists, is sufficient to establish a claim of duress.

Finally, we note that regardless of the effect of the release, an alternative basis for disposing of the appellee's fraud claims is provided by Florida's common law of waiver. Under certain circumstances, Florida courts have found that claims based on fraud have been waived by the subsequent execution of an agreement respecting the same subject matter as the alleged fraudulent transaction. *See, e.g., Bissett v. Ply-Gem Industries, Inc.,* 533 F.2d 142 (5th Cir. 1976); *Benn v. Key West Propane Gas Corp.,* 72 So.2d 910 (Fla.1954); *Harpold v. Stock,* 65 So.2d 477 (Fla.1953), 27 *Fla.Jur.2d, Fraud and Deceit* § 81 (1981). As these cases make clear, however, waiver will not be found unless the defrauded party had actual or imputed knowledge of the facts constituting the alleged fraud at the time the subsequent agreement was made. *Bissett v. Ply-Gem Industries, Inc., supra.* For the reasons previously described, we find that the appellees knew or should reasonably have known all the pertinent facts constituting the alleged fraudulent activities at the time the second franchise agreement was executed. Thus, we hold that the execution of the second franchise agreement amounted to a waiver of the appellees' claims based on fraud.

Because we hold that the appellees' claims were effectively precluded by the release and waiver, we find it unnecessary to discuss the other issues raised by Fiat Motors in this appeal. Accordingly, the judgments are REVERSED and the case is REMANDED for further proceedings not inconsistent with this opinion.