GRAND MOTORS, INC., et al., Plaintiffs,

v.

FORD MOTOR COMPANY, Defendant.

FORD MOTOR CREDIT COMPANY, Plaintiff,

v.

GRAND MOTORS, INC., et al., Defendants.

Nos. 80–0587CV–W–0, 81–0560–CV–W–0.

United States District Court, W.D. Missouri, W.D.

Dec. 21, 1982.

George E. Feldmiller, W. Perry Brandt, Kansas City, Mo., for defendant Ford Motor Co. and plaintiff Ford Motor Credit Co.

Robert F. Redmond, III, David M. Harding, Kansas City, Mo., for plaintiff and defendant, Grand Motors, Inc.

## MEMORANDUM DECISION AND ORDER

ROSS T. ROBERTS, District Judge.

Pending before the Court are motions for summary judgment and partial summary judgment in these two consolidated cases. Ford Motor Company (Ford) has moved that summary judgment be granted in its favor in Case No. 80–0587. In Case No. 81–0560, Ford Motor Credit Company (FMCC) has moved for partial summary judgment on its claim, and also for summary judgment in its favor on defendants' counterclaim. For the reasons stated below, the two former motions will be granted, while the latter will be denied.

On September 12, 1977, Grand Motors, Inc., and Ford executed a "Ford Sales and Service Agreement" (the dealership agreement) which established Grand Motors, Inc., as an authorized dealer of Ford-Mercury products, and set forth the respective rights and obligations of the contracting parties. The dealership, located in Cameron, Missouri, was to be operated under the name "Don Anderson Ford-Mercury, Inc." Donald E. Anderson and Grant A. Ragsdale were corporate officers and the shareholders of Grand Motors, Inc.[1]

At the inception of the dealership, Grand Motors, Inc., also executed an "Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement" (the financing agreement) with FMCC, under which FMCC agreed to establish and maintain for the dealership a wholesale line of credit, and to make advances to the dealership to finance its inventory. In return, FMCC was granted a purchase money security interest in all inventory and proceeds from the disposition thereof. Anderson and Ragsdale, together with their wives, Mary A. Anderson and Joan P. Ragsdale, executed a "Continuing Guaranty", whereby they agreed to be personally liable for all advances made under the financing agreement.

In October, 1977, Grand Motors, Inc. and FMCC entered into a "Capital Loan Security Agreement" (the capital loan agreement) whereby FMCC made loans for the purchase and operation of the dealership. The Andersons and Ragsdales also executed a personal guaranty of the corporate obligations under the capital loan agreement and its supplements. In October, 1978, Grand Motors, Inc., executed with FMCC a "Supplement to Capital Loan Security Agreement", pursuant to which Grand Motors, Inc., agreed to pay FMCC $77,148.00 as the balance due under the capital loan agreement.

Operation of the automobile agency proved to be unprofitable, and on August 20, 1979, Don Anderson Ford-Mercury, Inc., sent Ford a letter resigning its dealership. In terminating its affairs, the dealership desired to return to Ford certain unused inventory in return for credit against the

---

1. The corporate charter of Grand Motors, Inc. was forfeited January 1, 1981, for failure to file a 1980 Missouri Franchise Tax Return and Annual Report.

amounts owed under the financing and capital loan agreements. Plaintiffs were informed by representatives of Ford that before the company would agree to reacquire the inventory a general release in favor of Ford would be required. Plaintiffs complied with that demand on August 23, 1979, executing a "General Release" which released and discharged Ford "from all claims and demands whatsoever which ... any of the undersigned might or shall have by reason of anything whatsoever....." The circumstances attending the execution of the release will be developed more fully below. Following execution of the release,[2] Ford accepted the return of unused inventory as well as the resignation of the dealership. The dealership's remaining assets were liquidated and the proceeds applied to debts owed FMCC.

On June 19, 1980, Grand Motors, Inc., together with the Andersons and the Ragsdales,[3] filed their four-count complaint in Case No. 80–0587, alleging that Ford had violated the Automobile Dealers Franchise Act, 15 U.S.C. Sec. 1221 *et seq.* (Count I), that Ford had made fraudulent misrepresentations to plaintiffs (Count II), that Ford tortiously interfered with plaintiffs' contractual relations (Count III), and that Ford was liable to plaintiffs for punitive damages as a result of the actions complained of (Count IV). Plaintiffs' complaint charged, inter alia, that operation of the dealership was unprofitable due to the failure of Ford to provide the necessary support and guidance contemplated in the dealership agreement and in breaching oral promises made with respect to the quantities and mix of vehicles to be provided the dealership. Plaintiffs allege further that they found a qualified purchaser for the dealership, but that Ford arbitrarily refused to approve a sale to that individual, thus forcing the liquidation of the dealership at a substantial economic loss.

In August, 1980, Ford moved for summary judgment on three grounds: (1) that the individual plaintiffs lacked standing; (2) that the claims were barred by execution of the release; and (3) that the count seeking punitive damages failed to state a claim for relief. By Order dated February 16, 1981, Judge William R. Collinson denied Ford's motion without prejudice in order to "permit the case to be more fully developed through discovery." Ford was left free to renew its motion upon completion of discovery.

Following the Court's denial of summary judgment, FMCC filed suit in Case No. 81–0560 against Grand Motors, Inc., the Andersons, the Ragsdales and Robert F. Redmond III, for sums claimed to be due and owing FMCC under the financing and capital loan agreements. Counts I and III of the complaint sought to recover from Grand Motors, Inc., the sums of $16,203. and $39,612. respectively, for the unpaid balances purportedly remaining under the aforesaid agreements. Counts II and IV sought to impose those liabilities upon the Andersons and Ragsdales on the basis of their personal guaranties of the corporate obligations. Count V was brought against former officers and directors of the corporation (alleged to be Donald E. Anderson, Joan P. Ragsdale, Grant A. Ragsdale and Robert F. Redmond III), as statutory trustees of the defunct corporation, and sought recovery of the same amounts. Plaintiffs in turn filed a counterclaim, alleging FMCC to be an agent of Ford and incorporating their complaint in Case No. 80–0857. Prefatory to that appended document, plaintiffs charge that FMCC had actual or constructive knowledge of Ford's fraudulent misrepresentations, and broadly claim that FMCC acted in concert with Ford with respect to each of the claims asserted against Ford. The suit brought by FMCC was thereafter ordered consolidated with Case No. 80–0587.

---

**2.** The signed release was actually delivered to Ford along with a letter from plaintiffs' attorney dated September 10, 1979.

**3.** For the sake of consistency, Grand Motors, Inc., the Andersons and the Ragsdales will be referred to throughout this Order as "plaintiffs", even though they are the defendants in Case No. 81–0560.

With discovery largely complete in both cases, Ford again moves for summary judgment in its favor in Case No. 80–0587. FMCC joins in that motion by asking for partial summary judgment on the issue of liability in Case No. 81–0560, and for summary judgment against defendants on their counterclaim in the same case.

## MOTION BY FORD IN CASE NO. 80–0587

The single ground argued by Ford in its renewed quest for summary judgment is that plaintiffs' claims are barred by execution of the general release. For their part, plaintiffs seek to avoid summary judgment by arguing that the release was void for lack of consideration, that the release was induced by economic coercion and duress, and that the release was not intended to be a release of all claims against Ford, but only a limited release tied strictly to the return of inventory. Each of these contentions will be examined seriatim.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. In passing on a motion for summary judgment, a court must view the facts presented, plus all reasonable inferences to be drawn therefrom, in the light most favorable to the party opposing the motion. *Kuehn v. Garcia,* 608 F.2d 1143, 1146 (8th Cir.1979); *Inland Oil and Transport Co. v. United States,* 600 F.2d 725, 728 (8th Cir.1979), cert. denied, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). Where the moving party establishes beyond controversy that no factual dispute requiring resolution by trial exists, however, the granting of summary judgment is entirely proper, lest the rule's salutary purpose of avoiding needless and costly litigation be defeated. *Roberts v. Browning,* 610 F.2d 528, 531 (8th Cir.1979); *United States v. Porter,* 581 F.2d 698, 703 (8th Cir.1978).

■ The policy of the law being to encourage freedom of contract and the peaceful settlement of disputes, *Sanger v. Yellow Cab Company, Inc.,* 486 S.W.2d 477, 480 (Mo. banc 1972), a release will be presumed valid and, as an affirmative defense, may be given effect by means of summary judgment. *Dobbins v. Kawasaki Motors Corporation, U.S.A.,* 362 F.Supp. 54, 56–57 (D.Or.1973); *Oskey Gasoline & Oil Co., Inc. v. Continental Oil,* 534 F.2d 1281 (8th Cir. 1976); *Jackson v. Riley Stoker Corporation,* 57 F.R.D. 120 (E.D.Penn.1971). Where, as in this case, there is no dispute as to the execution of a release, the burden is on the party attacking the release to establish its invalidity. *McMahon v. Meredith Corporation,* 595 F.2d 433, 438 (8th Cir.1979); *Jenkins v. Simmons,* 472 S.W.2d 417, 420 (Mo. 1971). Absent a showing of fraud, duress, illegality or mutual mistake, the language of an otherwise voluntary release will be given full effect. *Coral Gables Imported Motorcars v. Fiat Motors,* 673 F.2d 1234, 1238 (11th Cir.1981); *Dickun v. United States,* 490 F.Supp. 136, 138 (W.D.Penn. 1980).

Turning to the present case, it is noted that the standard form release obtained by Ford has constituted the basis for granting summary judgment in favor of Ford in a number of cases involving similar fact patterns and claims. *Schmitt-Norton Ford, Inc. v. Ford Motor Co.,* 524 F.Supp. 1099 (D.Minn.1981); *Fabert Motors, Inc. v. Ford Motor Co.,* 355 F.2d 888 (7th Cir.1966), cert. denied, 384 U.S. 939, 86 S.Ct. 1462, 16 L.Ed.2d 539; *Three Rivers Motor Company v. Ford Motor Co.,* 522 F.2d 885 (3rd Cir. 1975); *Jerry Lewis v. Ford Motor Co.,* No. 78–311–1 (S.D.Iowa, Order Dated May 21, 1980); *Quality Ford, Inc. v. Ford Motor Co.,* No. C–78–0348 (D.Utah 1982). In the interest of restraining the length of this opinion, discussion of holdings in these cases will be had only as they provide specific guidance in analyzing plaintiffs' claims, but it may be noted generally that the cases have upheld the release involved herein as not being offensive to either state or federal public policy. *Schmitt-Norton Ford, Inc., supra* at 1104–1105; *Fabert Motors, Inc., supra* at

890–891; *Quality Ford, Inc., supra* at slip opinion p. 3. Of particular relevance to this case is *Schmitt-Norton,* where in addition to the public policy argument, the court considered and rejected arguments of lack of consideration and fraud and/or economic coercion. With this backdrop, I turn to plaintiffs' arguments.

### CONSIDERATION

■ Like any contract, a release given without consideration is void, and an agreement by a party to perform an act which that party is already legally bound to perform does not constitute consideration. *Aiple v. South Side National Bank in St. Louis,* 442 S.W.2d 145, 151 (Mo.App.1969); *Pennwalt Corp. v. Metropolitan San. Dist. of Greater Chicago,* 368 F.Supp. 972, 980 n. 8 (N.D.Ill.1973); *Inland Empire Builders, Inc. v. United States,* 424 F.2d 1370, 1375 (Ct.Cl.1970). Plaintiffs' first claim, that the release is void for failure of consideration, rests upon their assertion that Ford was obligated to accept a return of unused inventory regardless of plaintiffs' execution of a release.

■ An examination of paragraphs 21 and 23 of the dealership agreement refutes plaintiffs' claim that Ford was already obligated to reacquire the dealership's inventory. Those contractual provisions do create an obligation on the part of Ford to reacquire, at the price originally paid by the dealer, unused and unsold vehicles, parts, dealer signs, tools and service equipment still held by the dealer upon termination or nonrenewal of the dealership agreement, but that obligation is expressly conditioned upon the dealer executing a general release in exchange. That a reacquisition of unused inventory is not to be undertaken gratuitously by Ford is made clear at the outset of paragraph 21, which states as follows:

> "Upon termination or renewal of this agreement by the Company, the Dealer may elect as provided in paragraph 23 or, upon termination or nonrenewal of this agreement by the Dealer, the Dealer may demand in his notice of termination or nonrenewal, to have the Company purchase or accept upon return from the Dealer, *in return for his general release specified in paragraph 23 . . .*" (emphasis added)

Paragraph 23 in turn provides that:

> "In the event of termination or renewal of this agreement by the Company, the Company . . . shall submit to the Dealer a written tender of the benefits provided for in paragraph 21 . . . . Upon the Dealer's election to accept any such benefits, or upon the Dealer's demand of any such benefits upon termination or nonrenewal by the Dealer, the Company shall be released from any and all other liability to the Dealer with respect to all relationships and actions between the Dealer and the Company . . . . *Simultaneously with the receipt of any benefits so elected or demanded, the Dealer shall execute and deliver to the Company a general release with exceptions, as above described, satisfactory to the Company.*" (emphasis added)

The foregoing contractual provisions clearly establish that Ford was under no legal obligation to reacquire unused inventory from plaintiffs other than in exchange for plaintiffs' general release. Thus, in receiving credit from Ford for the return of the items, plaintiffs were obtaining something of value to which they had no previous right. As noted by Ford in its suggestions in support of the present motion, this is the very essence of consideration.

Nor, as suggested by plaintiffs, was there a failure of consideration because Ford paid merely the "dealer price" called for in paragraph 21, rather than a price over and above that, as Ford apparently did in *Schmitt-Norton* and *Fabert Motors.* Prior to their execution of the release, plaintiffs were not entitled to have Ford reacquire the inventory at any amount. In rejecting the contention of plaintiffs, I quote with approval the following observation by the Court in *Schmitt-Norton, id.* at 1103:

> "The key factor in determining the validity of the release is not the amount of consideration the person giving the re-

lease receives, unless it is merely a token amount, but rather whether the person received something for which he was not previously entitled." [4]

## ECONOMIC COERCION AND DURESS

Having determined that execution of the release was supported by consideration, I move to plaintiffs' second contention—that the release should be held invalid because it was signed under economic coercion and duress caused by the actions of Ford. To establish such a claim in the Eighth Circuit, plaintiffs must show three elements: (1) that one side involuntarily accepted the terms of the other; (2) that circumstances permitted no other alternative; and (3) that those circumstances were the result of coercive acts of the opposite party. *Oskey Gasoline & Oil Co., Inc. v. Continental Oil,* supra at 1286; *W.R. Grimshaw Company v. Nevil C. Withrow Co.,* 248 F.2d 896, 904 (8th Cir.1957), *cert. denied,* 356 U.S. 912, 78 S.Ct. 669, 2 L.Ed.2d 585 (1958); *Schmitt-Norton Ford, Inc., supra* at 1104. Whether the alleged facts are sufficient to raise the defense of duress is a question of law for the Court. *Oskey, supra* at 1286.

The acts alleged by plaintiffs to be coercive fall into two distinct categories, neither of which satisfy the showing required under *Oskey.* The first set of acts complained of—that plaintiffs were forced to cease operations due to the failure of Ford to provide a profitable line of vehicles, the failure of Ford to award plaintiffs a Lincoln franchise, and the rejection by Ford of a qualified purchaser for the dealership—merely repeat the allegations of plaintiffs' complaint, and do not pertain directly to the execution of the release. Assuming for the sake of argument that these acts created the financial distress which caused plaintiffs to resign the dealership, they still cannot be said to have caused plaintiffs to sign the release. *Schmitt-Norton Ford, Inc., supra* at 1104.

The other acts alleged focus more closely on the return of unused inventory, which plaintiffs deem as coercively preconditioned upon execution of the release. To substantiate their claim of coercion and duress, plaintiffs rely on the deposition testimony of Anderson and Ragsdale, and the affidavit by Ragsdale submitted in opposition to Ford's original motion for summary judgment. The circumstances as related by plaintiffs may be fairly stated as follows: Plaintiffs were advised by FMCC that due to their default under the financing agreement, a return of inventory was necessary in order to toll the accrual of interest charges. Failure to return the inventory to Ford meant not only continued interest assessments, but additional insurance and storage costs for the financially-distressed dealership, plus the attendant risks of depreciation and theft. Further, the lease held by plaintiffs on the dealership premises was due to expire on August 31, 1979, so that plaintiffs had to remove their inventory within less than two weeks from their letter of resignation. Obtaining space elsewhere to store the inventory until it could be sold to other dealers or individuals—the alternative of returning the inventory to Ford—was viewed as too costly and burdensome. (Anderson Dep. 167–178, 189–191, 200–215; Ragsdale Dep. 80–84; Ragsdale affidavit).

Under similar facts in *Schmitt-Norton* the court rejected a claim of coercion and duress, and I find nothing in the present facts to warrant a contrary result. Even after plaintiffs are accorded all favorable intendments from the above facts, they fail to establish the latter two elements articulated in *Oskey*—namely, that plaintiffs had no alternative but to sign the release, and that those circumstances were caused by Ford. Although it was not an economical-

4. Plaintiffs mount no challenge to the adequacy of the amount credited them by Ford; rather, it is acknowledged that they believed the credit received from Ford would be greater than the price obtainable from other prospective purchasers. (Ragsdale Dep. 83–84). The receipt of a higher price than from other purchasers would, according to the Court in *Schmitt-Norton,* preclude the existence of a material issue of fact as to the adequacy of consideration. Id., at 1103.

ly-desirable alternative for them, plaintiffs could have refused to sign the release, sold the inventory elsewhere, and sued Ford for the resulting damages. Plaintiffs' decision not to pursue this course was prompted by economic self-interest and the exigencies of time caused by the pending expiration of the lease, rather than any acts attributable to Ford.

Plaintiffs acknowledge that one reason they elected to return the inventory to Ford, even though it meant signing the release, was because they could obtain a better price by doing so than they could expect to obtain by selling the inventory in a piecemeal fashion to other sources. (Anderson Dep. 172–173; Ragsdale Dep. 81, 83–84). Even if I assume that selling the inventory elsewhere was not a viable option due to the costs of obtaining alternative storage, the factor of overriding significance remains that plaintiffs have failed to point to any evidence tending to show that their dilemma was the result of wrongful or oppressive conduct by Ford. The urgency caused by the pending expiration of the lease was of plaintiffs' own doing. Plaintiffs chose the date to submit their resignation, and, more importantly, they freely made arrangements with the lessor of the premises to surrender possession on or about September 1, 1979, rather than continue in possession until the lease's actual expiration later in the year. (Anderson Dep. 173–176). The following excerpts from Anderson's deposition testimony illustrate the self-inflicted nature of plaintiffs' quandary.

Q: "So you wanted out of the lease as soon as you could, if it was all right with Mrs. Quigley? (the lessor)

A: Yes, if we were going to close the dealership, then I had no reason to have the dealership facility sitting there, paying rent on it.

. . . . .

Q: That is what led to your time pressure in terms of your having to get the parts and inventory returned and your sale of the—auction of the other equipment?

A: That's correct.

. . . . .

Q: And you felt like you had no choice because of the timing on having to remove the dealership from the premises, and also you were desirous of having Ford Motor Company take back the parts and inventory rather than trying to sell them to consumers or other dealers?

A: That's correct."
(Anderson Dep. 175–178).

■ Nor is plaintiffs' claim of duress established by the fact that Ford insisted upon execution of the release prior to accepting a return of the inventory. As noted earlier, Ford had precisely that right under the dealership agreement. It is established beyond peradventure that duress will not be implied from the making of a hard bargain or from a showing that a release was given under the press of adverse business conditions. *Oskey Gasoline & Oil Co., Inc., supra* at 1286; *Three Rivers Motors Company, supra* at 893; see also, *Grant Renne & Sons, Inc. v. J.E. Dunn Constr. Co.,* 633 S.W.2d 166, 169 (Mo.App. 1982); *Chouinard v. Chouinard,* 568 F.2d 430, 434–435 (5th Cir.1978); *Undersea Eng. & Constr. Co. v. International Tel. & Tel. Corp.,* 429 F.2d 543, 550 (9th Cir.1970); *Coral Gables Imported Motorcars v. Fiat Motors, supra* at 1239. As such, I find plaintiffs' second defense to the release to be legally and factually without merit.[5]

## INTENT

■ Finally, plaintiffs argue that they did not intend to relinquish all claims against Ford by signing the release; rather, that they signed the release only as a pre-

---

5. A further relevant consideration in rejecting plaintiffs' claim of economic coercion and duress is the fact that they were thoroughly advised by competent counsel prior to signing the release. *Coester v. H.H.B. Co.,* 447 F.Supp. 372, 379 (D.S.D.1978). (See, Redmond Dep. 14–25).

**42**

requisite to returning the inventory. Plaintiffs submit that summary judgment would be inappropriate because a triable issue of fact remains as to intent.

■ "The primary rule of construction in interpreting the language of a release is that the intention of the parties shall govern." *State ex rel. Stutz v. Campbell,* 602 S.W.2d 874, 876 (Mo.App.1980). While in certain instances it is proper to resolve the question of intent by considering the surrounding facts and circumstances under which the parties acted, *State ex rel. Normandy Orthopedics v. Crandall,* 581 S.W.2d 829, 833 (Mo. banc 1979), where the language of a release is unambiguous, its meaning is to be garnered from the instrument alone. *State ex rel. Stutz, supra* at 876; *Three Rivers Motor Company, supra* at 894; *ACF Produce, Inc. v. Chubb/Pacific Indem. Group,* 451 F.Supp. 1095, 1101 (E.D. Penn.1978); *Taylor v. Beech Aircraft,* 407 F.Supp. 69, 72 (W.D.Okl.1976). Moreover, where the terms of a release are unambiguous, construction of the release becomes a question of law for the court. *Cornwell v. Zieber,* 599 S.W.2d 22, 25 (Mo.App.1980); *Fuls v. Shastina Properties, Inc.,* 448 F.Supp. 983, 988 (N.D.Cal.1978).

I find that the operative language of the present release is not only unambiguous in its terms, but that it qualifies the document as a general release. The intent therein expressed to "release and discharge Ford from all claims and demands whatsoever" which plaintiffs might "have by reason of anything whatsoever occurring prior to the date" of the release, with narrow exceptions not at issue here, is indisputably broad enough to constitute a bar to plaintiffs' present action. *Dill v. Poindexter Tile Company,* 451 S.W.2d 365, 374 (Mo.App. 1970). Given the unambiguity of the release, plaintiffs cannot now limit its scope by directing attention to correspondence with Ford which plaintiffs claim communicated their intent that the release be of a limited genre.

Furthermore, the deposition testimony of Anderson and Ragsdale reveals a full awareness throughout their discussions with one another, their attorney, and representatives of Ford, that the release could constitute a defense to the lawsuit they were contemplating against Ford. (Anderson Dep. 181–183, 187–191, 213–214; Ragsdale Dep. 77–78, 81–85). Mr. Anderson's testimony confirms his knowledge of the possible consequences:

Q: "And that's what you were trying to do, you were trying to avoid signing the general release?

A: Exactly right.

Q: Okay. And towards the latter part of August, it became apparent to you that you were—if you wanted to return the parts to Ford for credit, and the inventory to Ford for credit, you were going to have to execute the general release.

A: Yes.

Q: Even though you were aware that you planned on filing a lawsuit against Ford?

A: Yes.

Q: And you knew that that general release could have some impact on whether you were going to be able to maintain that suit against Ford which you were contemplating filing?

A: Yes."

(Anderson Dep. 213–214)

Plaintiffs' attorney, Mr. Redmond, has also testified to that effect:

A: "... was there any question in your mind that this release was a general release of all claims, as opposed to a release of some specific type of claim?

A: Well, I felt that, certainly, it would cover basically everything that they were talking about, so far as complaints against Ford Motor.

Q: Okay. And did you indicate that to them when you had your discussions with them?

A: Yes."

(Redmond Dep. 21–22)

Given the clear and unambiguous language of the release, coupled with the admissions by plaintiffs of their knowledge of its probable effect, there is no genuine issue of fact as to either the scope of the release or the intent of the parties in executing it. The record indicates that plaintiffs signed the release not due to fraud, economic coercion, or even by mistake as to its meaning, but for economic reasons, with the calculated hope that it might later be held invalid in court. Having voluntarily entered into the release and accepted its benefits, plaintiffs may not now escape its consequences. I therefore conclude that summary judgment is appropriate in favor of Ford.

### MOTION BY FMCC IN CASE NO. 81–0560

FMCC's Claim

■ Turning to FMCC's motion for partial summary judgment in its favor on the issue of liability in Case No. 81–0560,[6] I find that the record reveals no genuine issue of fact as to the liability of Grand Motors, Inc., the Andersons, and the Ragsdales in some amount for remaining balances under the financing and capital loan agreements. Plaintiffs have admitted executing not only the foregoing agreements with FMCC, but also the personal guaranties which form the basis of Counts II and IV whereby FMCC seeks to impose personal liability on the individuals for the corporate obligations created under those agreements. The deposition testimony of Donald Anderson and Grant Ragsdale unequivocally concedes the existence of said liability. Anderson testified as follows:

A. ".... I don't feel like we owe them the amount that they feel like we owe.

    .    .    .    .    .

A. As I recall, I believe Grant and I determined that there was probably from twenty-four to twenty-seven thousand dollars that we felt that we

owed them after our sale number one, and after the parts were returned, which they got the credit monies for at that time.

    .    .    .    .    .

A. I'm not denying that we owe them money, we do. To know exactly how much, it is going to be a little difficult to determine...."

(Anderson Dep. 135–137)

Ragsdale's testimony is to the same effect:

Q: "Well, has the capital loan been paid off or any of it paid, do you know?

A: Yes, most of it.

Q: What about the floor plan financing?

A: We brought it down to—and consolidated it with the balance due.

Q: What balance do you believe is due and owing to Ford Motor Credit at this time?

A: $24,000.00."

(Ragsdale Dep. 47–48)

■ The only issues of fact relevant to the Andersons and the Ragsdales which remain in dispute go to the amount of damages, insofar as plaintiffs claim that they were not credited for the return of certain tools, that the amounts claimed by FMCC should be reduced by monies from a dealer reserve account, and that the cut-off date for interest was earlier than claimed by FMCC. (Anderson Dep. 137; Ragsdale Dep. 49–56). Where the only uncertainty is to the amount of an indebtedness, the granting of partial summary judgment on the issue of liability is an appropriate means of avoiding pointless litigation. See, e.g., *Blackford v. Action Products Company, Inc.,* 92 F.R.D. 79, 80 (W.D.Mo.1981); *American Training Services v. Commerce Union Bank,* 415 F.Supp. 1101, 1106 (M.D. Tenn.1976), aff'd, 612 F.2d 580 (6th Cir. 1979). For the reasons stated, partial summary judgment will be granted FMCC against Grand Motors, Inc., the Andersons

---

6. Rule 56(c) provides in pertinent part that: "A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue of fact as to the amount of damages."

and the Ragsdales, in an amount to be subsequently determined by trial of the damages issues.

One remaining aspect of FMCC's claim overlooked by the parties in their suggestions is Count V, which seeks to impose liability upon Donald Anderson, Joan Ragsdale, Grant Ragsdale and Robert F. Redmond III as statutory trustees under Sec. 351.525, R.S.Mo.1978.[7] Since it has been admitted and determined that the former three individuals are liable on their personal guaranties of the corporate obligations, it is unnecessary to consider their potential liability under this theory as well. There does exist, however, a genuine dispute as to whether Redmond was a director or officer of Grand Motors, Inc., at the time the corporate charter was forfeited (Para. 17 of Plaintiffs' response to FMCC's request for admissions; Redmond Dep. 10), so that summary judgment as to him would be inappropriate.

### PLAINTIFFS' COUNTERCLAIM

FMCC also moves for summary judgment with respect to the counterclaim through which plaintiffs seek to impose liability upon FMCC as an agent of Ford for the wrongful acts alleged to have been committed by Ford. The alleged conduct by Ford which plaintiffs would also ascribe to FMCC has been generally mentioned above, and a specific recitation of those claims is not required. It is argued by FMCC that the general release executed in favor of Ford by plaintiffs operates as a matter of law to discharge FMCC from any liability in connection with the establishment and operation of the dealership, and that in any event, the deposition testimony of plaintiffs

fails to establish the existence of any genuine issue of fact as to the claim of agency.

Concerning first the scope of the release, it is undisputed that FMCC is not a named releasee in the instrument. FMCC's argument that the release nonetheless operates as a general release of plaintiffs' causes of action, even as against unnamed tortfeasors, rests on this Court's decision in *Swope v. General Motors Corp.,* 445 F.Supp. 1222 (W.D.Mo.1978).

The plaintiff in *Swope* instituted a products liability action against the manufacturer of a school bus for injuries received as the result of an accident involving the bus. A negligence action previously brought in state court by plaintiff against the driver of the bus and her employer had resulted in a settlement between those parties. The manufacturer in *Swope* moved for summary judgment on the basis that the release executed by plaintiff with the driver and employer discharged the latter individuals from "all claims, demands, damages, actions, causes of action or suits of any kind." *Id.* at 1226.

In rejecting plaintiff's argument that it had been her intention to release only the named parties, the court in *Swope* followed, as it was bound to do, those Missouri cases holding that in order for a plaintiff to preserve a cause of action against a remaining tortfeasor when reaching settlement with another, that right to proceed must be expressly reserved by appropriate language in the release itself. *Liberty v. J.A. Tobin Construction Co., Inc.,* 512 S.W.2d 886, 890 (Mo.App.1974); *Black v. Sanders,* 414 S.W.2d 241, 244–245 (Mo.1967).[8] Application of the parol evidence rule, the court observed, prevented a party from introducing extrinsic proof of intent. See, *e.g.,*

---

7. Section 351.525(4) states in part that: "... the directors and officers in office when the forfeiture (of corporate existence and rights) occurs shall be the trustees of the corporation ... and the trustees shall be jointly and severally responsible to the creditors and shareholders of the corporation to the extent of its property and effects that shall have come into their hands."

8. The effect was to extinguish a cause of action against a joint tortfeasor as a matter of law. *Liberty v. J.A. Tobin Construction Co., Inc., supra; Kestner v. Jakobe,* 412 S.W.2d 205 (Mo. App.1967). In cases involving successive tortfeasors, it was also held that the release of the original tortfeasor, absent an express limitation, acted to also discharge the successive tortfeasor. *McQueen v. Humphrey,* 421 S.W.2d 1 (Mo.1967); *Rogers v. Piper,* 543 S.W.2d 261 (Mo.App.1976).

*Lugena v. Hanna,* 420 S.W.2d 335, 340 (Mo. 1967); *Rogers v. Piper, supra.* Based upon a thorough examination of Missouri cases, the court granted summary judgment for the manufacturer in *Swope,* holding that even though the manufacturer was not specifically named in the release, that instrument served to extinguish plaintiff's cause of action against the manufacturer, because the language of the release disposed of any and all claims the plaintiff might have against remaining tortfeasors. *Id.,* at 1228–1229. The court summarized existing Missouri law on the subject thusly:

"... if the release clause in the instrument mentions *only* that the consideration is received 'in full of all claims against the defendant' then it may be a partial release. However, if the consideration is received in full of all 'claims, demands, damages, actions, causes of action' and accepted for the purpose of making 'full and final compromise, adjustment and settlement' for injuries 'known or unknown, which have resulted, or may in the future develop', then it is indicative that it is a general release unless there is a 'specific and clear limitation of the intended scope of the settlement where such consideration is described as partial, rights reserved as to remaining tortfeasors, or other appropriate language. *Liberty v. Tobin,* supra, 512 S.W.2d 889–890" (emphasis supplied).

By application of the foregoing principles, the present release could arguably be categorized as partial, since its language reads that plaintiffs "release and discharge *Ford* from all claims and demands whatsoever which against *Ford*" they "might or shall have" (emphasis added). It is unnecessary for me to divine how Missouri courts would interpret the release under the case law determinative in *Swope,* however, due to a subsequent change in Missouri law dispelling the legal presumptions previously followed. Some three months after the court's opinion in *Swope,* the Missouri Supreme Court held in *State ex rel. Normandy Orthopedics v. Crandall,* 581 S.W.2d 829 (Mo. banc 1978), that "a release purporting to comprehend any and all claims arising from a particular incident, including claims against unspecified strangers to the agreement, does not necessarily bar subsequent suits against an unspecified third party." *Id.* at 833. Concomitantly, the court declared that the admission of parol evidence would be permitted to resolve the issue of intent. *Id.* at 834.

*Crandall* involved an original/successive tortfeasor fact pattern, but the above-quoted language is sufficiently broad to comprehend a case such as the one at bar involving joint tortfeasors. On the basis of the *Crandall* decision, this Court is constrained to reject FMCC's argument that the release serves as a matter of law to shield it from plaintiffs' claims. The issue of whether plaintiffs and Ford intended the release to constitute a bar to claims against FMCC or other parties unnamed in the release has not been treated by the parties, hence a genuine issue of fact remains which makes summary judgment inappropriate.

Neither, as FMCC insists, is summary judgment warranted because there exist no assertions of fact to support the theory that FMCC acted as an agent of Ford. FMCC accurately points to the deposition testimony of plaintiffs admitting their lack of knowledge of any facts to support their claims against FMCC, and it may also be discerned that the vast majority, if not all, of plaintiffs' discussions concerning the release were had with representatives of Ford, not FMCC. (Ragsdale Dept. 109–114; Anderson Dep. 169, 178, 186). I decline to grant summary relief solely on the basis of the depositions, however, as little of the discovery efforts have been directed to the issue of agency, and FMCC itself has failed to file affidavits or other materials clearly showing its right to judgment as a matter of law. The record generally indicates an interrelationship of some nature between Ford and FMCC with respect to the return of unused inventory, and I deem it to be in the interest of justice to enable plaintiffs further opportunity to make a submissible case.

Also underlying this decision is the sound principle that the determination of an agency relationship is a highly factual one generally left to the province of a jury. *Northern v. McGraw-Edison Co.,* 542 F.2d 1336, 1343 (8th Cir.1976), *cert. denied,* 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1977); *Jordan v. Robert Half Personnel Agencies of Kansas City, Inc.,* 615 S.W.2d 574, 582 (Mo.App.1981). Without evaluating the likelihood of plaintiffs' ultimate success in establishing their counterclaim, I note only that it remains their burden to adduce credible facts showing that FMCC acted on behalf of or was representing Ford with the latter's express or implied authority. *George v. Lemay Bank & Trust Co.,* 618 S.W.2d 671, 674 (Mo.App.1980); *Dudley v. Dumont,* 526 S.W.2d 839, 843–844 (Mo.App. 1975). FMCC's observations of the current state of the evidence on this issue are well-taken, but I find that sound judicial policy considerations—in particular my reluctance to resolve as a matter of law the question of an agency relationship—lead me to conclude that summary judgment would not be appropriate at this time. See, e.g., *Roberts v. Browning, supra* at 536.

For the reasons stated hereinabove, it is therefore,

ORDERED that the motion by Ford in Case No. 80–0587 for summary judgment is granted; and it is further

ORDERED that the motion by FMCC in Case No. 81–0560 for partial summary judgment on the issue of liability is granted; and it is further

ORDERED that the motion by FMCC in Case No. 81–0560 for summary judgment in its favor on the counterclaim is denied.