William Clarke **HYMAN** As Assignee of the claims of William Clark Motors, Inc. Plaintiff,

v.

**FORD MOTOR COMPANY** Defendant.

No. 2:99–2532–11.

United States District Court, D. South Carolina, Charleston Division.

Feb. 22, 2001.

Fred Thompson, III, Ness Motley Loadholt Richardson and Poole, Mt. Pleasant, SC, P. Benjamin Zuckerman, Sachs Sax and Klein PA, Boca Raton, FL, for William Clarke Hyman, individually and as Assignee of the claims of William Clarke Motors Inc, William Clarke Motors, Inc., plaintiffs.

John H. Fleming, Sutherland, Asbill & Brennan, Atlanta, GA, Richard B. Watson, Craig Burgess, Nelson Mullins Riley & Scarborough, Charleston, SC, for Ford Motor Company, defendants.

## ORDER

HAWKINS, Senior District Judge.

This matter is before the court on Defendant Ford's motion to dismiss and Plaintiff Hyman's motion for partial summary judgment. This is an automobile dealership dispute between Ford and Hyman concerning Hyman's former Lincoln Mercury Dealership in Charleston, South Carolina. Hyman is seeking a declaratory judgment that a release he signed in 1996 is void and is also seeking damages based on alleged violations of various sections of the South Carolina Regulation of Manufacturers, Distributors and Dealers Act, S.C.Code § 56–15–10 et seq.

## STANDARD OF REVIEW

Ford moved to dismiss this case under Rule 12(b)(6). However, when a court considers matters outside the pleadings, the motion for dismissal under Rule

12(b)(6) can be converted to a motion for summary judgment and disposed of pursuant to Rule 56, Fed.R.Civ.P. Thus, Ford's motion has been converted into a summary judgment motion.

In deciding a summary judgment motion, the court must look beyond the pleadings and determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 243, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ If defendant carries its burden of showing there is an absence of evidence to support a claim, then plaintiff must demonstrate by affidavits, depositions, interrogatory answers or admissions on file that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–35, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for plaintiff. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. An issue of fact concerns "material" facts only if establishment of the fact might affect the outcome of the lawsuit under governing substantive law. *Id.* A complete failure of proof concerning an essential element of a cause of action necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. Moreover, production of a "mere scintilla of evidence" in support of an essential element will not forestall summary judgment. *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505.

In other words, summary judgment should be granted in those cases in which it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law. *McKinney v. Bd. of Trustees of Mayland Comm. College*, 955 F.2d 924, 928 (4th Cir.1992). In making its determination under this standard, this court must draw all inferences from the underlying facts in the light most favorable to plaintiffs. *Matsushita*, 475 U.S. at 587–88, 106 S.Ct. 1348.

## FACTS IN LIGHT MOST FAVORABLE TO PLAINTIFF

The facts alleged by Hyman in his verified complaint are lengthy and detailed and assert numerous wrongful acts on behalf of Ford. However, for purposes of this motion, the relevant acts, taken in the light most favorable to Hyman are as follows:

In 1991, Hyman was the principal owner of William Clarke Motors, Inc. ("WCM"). In February 1991, WCM contracted to acquire the assets and business of Parker Lincoln–Mercury in Charleston for $1,600,000. The sale was expressly conditioned upon approval of WCM as a Lincoln–Mercury dealer, which, in turn, required that Hyman be approved as a principal owner of WCM. In June 1991, Ford approved the purchase of the Parker dealership by WCM, and on June 14, 1991, WCM and Ford entered into a Lincoln Sales and Service Agreement and a Mercury Sales and Service Agreement (collectively hereinafter referred to as "the Agreement")[1]. The Agreement expressly provides that "the rights of the Dealer and [Ford] ... are defined and limited by the terms of [the Agreement]

---

1. The Agreements, virtually identical, are attached to the Complaint as Exhibits 1 and 2.

and applicable law." See Agreement at Preamble p. iii.

After several years, the relationship between Hyman and Ford soured because Hyman was not meeting Ford's "Planning Volume" [2] even though he aggressively promoted the retail sale of new Lincoln and Mercury vehicles. Ford believed Hyman was selling too many "program" [3] cars and not enough new cars.

In November 1994, Hyman sought permission from Ford to sell his satellite dealership, and retain the main dealership, so that the proceeds of the sale could be used to pay off an adverse judgment and to increase working capital. This request was denied by Ford because Hyman was not meeting the Planning Volume. Thereafter, Hyman was threatened with termination and pressured to sell his dealership.

As a result, Hyman sought to sell the assets of WCM and on December 20, 1994, Hyman signed and sent to Ford a "Letter of Intent to Terminate and Request for Company Assistance in Finding a Buyer". The efforts to find a new buyer for the dealership were unsuccessful, due to the improper acts of Ford. Consequently, on September 11, 1995, WCM filed a Chapter 11 petition in the U.S. Bankruptcy Court for the District of South Carolina in September 1995.

In the course of the Chapter 11 proceedings, Hyman arranged to have his parents, Haywood B. Hyman and Frances C. Hyman as principle owners of Charleston Lincoln Mercury Dealership ("CLM"), acquire the assets of WCM dealership. With the oversight and approval of the bankruptcy court, on or about March 12, 1996, Hyman and WCM sold the assets to CLM for $5.3 million. Hyman's parents were to be approved as an authorized dealer by Ford. Thereafter, on March 15, 1996, the bankruptcy court approved the subsequent termination of WCM's Agreement with Ford. This bankruptcy Order states:

> Pursuant to this Court's previous Order [dated December 15, 1995] authorizing the sale of substantially all of the assets of William Clarke Motors, Inc. ("WCM") to Charleston Lincoln Mercury ("CLM"), this Court has been advised that the parties have completed all of the necessary contingencies associated with this Court's previous Order. One of the contingencies in this Court's previous Order related to Ford Motor Company ("Ford") authorizing CLM to become a dealer for Lincoln–Mercury. This Court is informed that CLM will be approved to become a Lincoln–Mercury Dealer; however, prior to CLM's appointment, WCM must resign as a Lincoln–Mercury Dealer.

> WCM is a party to certain Lincoln and Mercury Sales and Service Agreements, dated June 14, 1991, with Ford's Lincoln Mercury Division (the "Agreements"). These Agreements authorize WCM to operate as a Lincoln–Mercury Dealer. With the approval of this Court, WCM sold its assets and consequently is out of business. Accordingly, WCM intends to reject the Agreements and resign as a Lincoln–Mercury dealer in accordance with the terms of the Agreements. Ford Motor Company, by the signature below, consents to the re-

---

**2.** Planning Volume is defined in the Agreement at ¶ 1(n) as the average annual estimated sales base for vehicles established by Ford for the Dealer from time to time for planning purposes based on historical sales and registrations and current trends in the Dealers' locality.

**3.** The "program" cars that Hyman sold were Lincoln and Mercury off-lease and off-rental program vehicles, subsidized, financed and repurchased by Ford and promoted to Lincoln Mercury dealers for resale to the public.

jections of the Agreements and waives any further notice and hearing with respect to his rejection. It is therefore,

ORDERED, ADJUDGED AND DECREED, that the Court hereby approves the rejection of the Agreements by the Debtor, pursuant to section 365(a) of the Bankruptcy Code, and *approves WCM's delivery of its resignation letter to Ford,* copies of which are attached hereto as Exhibit A. (emphasis added)

This Order was signed by the Honorable John E. Waites and was consented to by Richard Glesissner, Esq., attorney for Hyman, and Thomas Byrne, Esq., attorney for Ford.

The "resignation letter" referenced and approved by the bankruptcy court was signed by Hyman on January 9, 1996. This letter to Ford from Hyman, as president of WCM, states:

We hereby resign our ... Lincoln and Mercury Sales and Service Agreements, dated June 14, 1991, pursuant to subparagraph 17(a) upon the condition that you execute such Agreements with Haywood B. and Frances C. Hyman doing business as Charleston Lincoln Mercury, Inc. In accordance with the provisions of the aforesaid Agreements we request Ford Motor Company to repurchase from us new, unused and undamaged eligible parts in an amount not to exceed $275,000. Pursuant to subparagraph 21(g) [4], *we hereby assign such parts return privilege to our replacement Dealer, Haywood B. Hyman* .... In return for our repurchase request, and as

required by you and in accordance with the applicable provisions of the respective Agreements, *we hereby release Ford Motor Company from all other liability to us* except for such amounts as Ford may have agreed, in writing, to pay us and will furnish as required by Ford a satisfactory general release. (emphasis added)

*See* Letter dated January 9, 1996 from Hyman to Ford.

On March 19, 1996, Hyman executed the General Release in exchange for the repurchase of assets by Ford and the assignment of that right to the replacement dealer, CLM. The Release states:

William Clarke Lincoln–Mercury ... hereby acknowledges receipt from Ford Motor Company ... all of the benefits to which the Dealer is entitled, under Paragraph 21 [5] of the Dealer's Lincoln and Mercury Sales and Service Agreements dated June 14, 1991, upon the non-renewal or termination of said Sales and Service Agreements. Dealer and each of the undersigned principal owners of the Dealer, hereby jointly and severally, release and discharge Ford from all claims and demands whatsoever with respect to the above Sales and Service Agreements and their related matters against Ford .... [6]

Hyman executed the General Release personally and as President of WCM. As a result, Ford paid $190,153.27 to CLM for the dealership's unwanted parts.

---

4. Paragraph 21(g) of the Agreement allows the Dealer to assign the parts return privilege to an approved replacement dealer.

5. Paragraph 21 states in relevant part: "upon termination or nonrenewal of this agreement by the Dealer, the Dealer may demand in his notice of termination or nonrenewal, to have

the Company purchase or accept upon return from the Dealer [various assets], in return for his general release ...."

6. There are certain exceptions noted in the General Release, but none of them are relevant to this matter.

## ANALYSIS

Over three years after the General Release was executed, Hyman filed this action seeking to void the General Release and pursue various claims for monetary damages. Ford has moved to dismiss all of Hyman's claims on the basis that Hyman executed a General Release in favor of Ford which bars all of Hyman's claims and under the doctrine of laches. In response, Hyman raises several issues regarding whether dismissal is appropriate in this case. Hyman does not dispute that he entered into the release or that the release, if valid, would bar these claims. Rather, Hyman asserts that the release was not supported by valuable consideration and thus, is not an enforceable contract; that the release was executed under duress and coercion and thus, is voidable; that the release was not approved by the bankruptcy court; and finally, that the release is in violation of the South Carolina Regulation of Manufacturers, Distributors and Dealers Act. Hyman also moves for partial summary judgment seeking a declaration that the General Release is invalid because it was not approved by the bankruptcy court. Hyman has submitted his own affidavit, as well as affidavits from Frances C. Hyman and John C. Conway, Jr., stating he was under duress at the time he executed the General Release.

### a. *Lack of Consideration*

Hyman argues that the release is invalid because it was not supported by valuable consideration. Hyman's theory rests upon two assertions: 1) that he did not receive a benefit; and 2) that Ford was obligated to accept a return of unused inventory regardless of Hyman's execution of the release.

Releases are governed by the same principles of adequacy of consideration that apply to other contracts. *Wilson Group, Inc. v. Quorum Health Resources, Inc.*, 880 F.Supp. 416, 425 (D.S.C. 1995); *Lowery v. Callahan*, 210 S.C. 300, 42 S.E.2d 457, 458 (1947). Like any contract, a release given without consideration is void. However, when the consideration for a release is something of value, courts will not void a release absent fraud, coercion or undue influence. *Id.*

Hyman argues that the money ($190,-153.27) for the returned parts did not constitute consideration because he did not personally receive the money. Rather, the funds went to the replacement dealer, CLM. Thus, Hyman argues that he did not receive any consideration. As his attorney argued before this court: "... in fact I do understand that 190 thousand dollars was allowed to a successor dealer, Charleston Lincoln–Mercury, to return parts. There was no payment made to the parties that stand before you today. Mr. Clarke Hyman didn't get any money, his dealership didn't get any money, number one." Transcript of February 28, 2000 hearing at p. 25, ln 16–20.

This argument is without legal merit. The Restatement (Second) of Contracts states that "to constitute consideration, a performance or a return promise must be bargained for"; that is, "sought by the promisor in exchange for his promise and ... given by the promisee in exchange for that promise." Restatement (Second) of Contracts § 71(1) & (2). As noted in Section 71(4) of the Restatement, "the performance or return promise may be given to the promisor or to some other person. It may be given by the promisee or by some other person." Comment (e) to § 71(4) clarifies this statement of law: "it matters not from whom the consideration moves or to whom it goes. If it is bargained for and given in exchange for the promise, the promise is not gratuitous." This legal principle has been applied to situations

involving releases. *See Young v. Nissan Motor Corp.*, 964 F.Supp. 1350 (W.D.Mo. 1997), *aff'd* 149 F.3d 1189, 1998 WL 322590 (8th Cir.1998) (a general release that plaintiff entered into with a negligent driver was valid, binding and supported by adequate consideration and thus barred plaintiff's product liability claims against Nissan even though Nissan did not pay the consideration, as "the source of the consideration is irrelevant so long as the contract is sufficiently supported by consideration"); *Andes v. Albano*, 853 S.W.2d 936 (Mo.1993)(in a divorce settlement which included a general release of all claims against plaintiff's husband and his lawyers, the court held that the release in favor of the lawyer was supported by consideration because adequate consideration flowed between plaintiff and her husband; the court stated "if consideration is sufficient for a contract in other respects, it does not matter from whom or to whom it moves").[7]

 Thus, the fact that Hyman did not personally receive the parts return privilege (approx.$190,000) is of no consequence to the determination of consideration. Hyman did in fact receive something of value in exchange for the General Release—the benefit of assigning the parts return privilege to CLM. That benefit is sufficient consideration for the General Release. The law is clear that consideration does not fail when a third person receives the benefit of the consideration.

Next, Hyman argues that consideration fails because Ford was already obligated to buy back the inventory under the terms of the Agreement, and an agreement by a party to perform an act which that party is already legally bound to perform does not constitute consideration. This argument also is without legal merit.

This issue has been addressed in a factually similar case, *Grand Motors, Inc. v. Ford Motor Co.*, 564 F.Supp. 34, 39–40 (W.D.Mo.1982). The contractual terms in the Agreement in this case are identical to the terms at issue in the *Grand Motors* case. As noted in *Grand Motors*, an examination of paragraphs 21 and 23 of the Agreement refute Hyman's claims that Ford was already obligated to reacquire the dealership's inventory.

Paragraphs 21 and 23 of the Agreement do create an obligation on the part of Ford to reacquire unused parts and inventory still held by the dealer upon termination or nonrenewal of the dealership agreement, but that obligation is expressly conditioned upon the dealer executing a release. That a reacquisition of unused parts and inventory was not to be undertaken gratuitously

7. For other scenarios where this legal principle has been applied, *see In re Rolfe*, 710 F.2d 1, 2 (1st Cir.1983)(finding adequate consideration when consideration for mortgage flowed to debtor's corporation rather than debtor); *Republic Ins. Co. v. DiNardo Auto Sales, Inc.*, 44 Conn.Supp. 207, 678 A.2d 516, 522 (1995), *aff'd* 41 Conn.App. 686, 677 A.2d 21 (1996) (citing Section 71(4), the court found adequate consideration, stating "that a party other than the defendant may have been the direct beneficiary of the plaintiff's promise and its performance is of no moment"); *New Bedford Instit, for Savings v. Gildroy*, 36 Mass.App.Ct. 647, 634 N.E.2d 920, 927 (1994) "It is well established in our law that the physical movement of consideration—whether from promisee directly to promisor, from promisor to a third party at the promisee's direction, or from a third person at the promisor's direction—is irrelevant, so long as the promisee incurs a detriment or the promisor receives a benefit."; *Morgan v. Bargersville State Bank*, 585 N.E.2d 306, 307 (1992)(the consideration necessary to support a contract need not be given to the promisor; it may be given to another party); *Mid–America Real Estate & Investment Corp. v. Lund*, 353 N.W.2d 286, 289 (N.D.1984)(it is not essential that the consideration flow directly to the promisor, and the promise is enforceable if there is a benefit or advantage to the promisor, or some loss or detriment to the promisee).

by Ford is made clear at the outset of paragraph 21, which reads:

> Upon termination or nonrenewal of this agreement by the Company, the Dealer may elect as provided in paragraph 23 or, upon termination or nonrenewal of this agreement by the Dealer, the Dealer may demand in his notice of termination or nonrenewal, to have the Company purchase or accept upon return from the Dealer, *in return for his general release* specified in paragraph 23: [unused parts and inventory]. (emphasis added)

Paragraph 23 in turn provides:

> In the event of termination or nonrenewal of this agreement by the Company, the Company, within thirty (30) days after the effective date thereof, shall submit to the Dealer (1) a written tender of the benefits provided for in paragraph 21 .... Upon the Dealer's election to accept any of such benefits, or upon the Dealer's demand of any such benefits upon any termination or nonrenewal by the Dealer, the Company shall be released from any and all other liability to the Dealer with respect to all relationships and actions between the Dealer and the Company .... Simultaneously with the receipt of any benefits so elected or demanded, the Dealer shall execute and deliver to the Company a general release with exceptions, as above described, satisfactory to the Company.

As recognized in *Grand Motors,* these contractual provisions clearly establish that Ford was under no legal obligation to reacquire unused inventory from Hyman, other than in exchange for Hyman's General Release. Thus, in assigning credit from Ford for the return of these items, Hyman received consideration for the General Release because he obtained something of value to which he had no previous right.

Hyman also argues that paragraph 3(e) of the Agreement entitles him to return unused parts and inventory. This provision states:

> **Return and Allowances.** The Dealer shall be entitled to such allowances, discounts, incentives and return privileges from the Company on GENUINE PARTS subject to such condition and procedures as may be specified in the applicable PARTS AND ACCESSORIES TERMS OF SALE BULLETIN or other notice pertaining thereto sent to the Dealer by the Company. (emphasis in original)

This contractual provision does not support Hyman's position. First, it clearly states that return privileges were "subject to such conditions and procedures" set forth in sales bulletins or other notices. It clearly does not create an absolute right to such privilege. Hyman has failed to direct the court's attention to any bulletin or notice allowing Hyman to a parts return privilege.

Pursuant to the express terms of the Agreement, Ford was under no legal obligation to reacquire unused inventory from Hyman other than in exchange for a General Release. Thus, in assigning the buy back privilege from Ford to CLM, Hyman was obtaining something of value to which they had not previous right. There can be but one conclusion from the facts of this case: the General Release was supported by adequate consideration.

### b. *Duress and Coercion*

Having determined that execution of the release was supported by consideration, the court must now determine whether the release should be held invalid because it was signed under duress caused by the actions of Ford. In support of his position, Hyman provides an affidavit which states:

At closing, I delivered the release at issue here. I did so under duress. In this regard, Ford made me so afraid of what it would do to me and my parents and the further monetary harm they would cause to me and them that I felt compelled to do whatever they asked me to do to get the sale finally through. Although I signed the release at issue in this case, and the Resignation Letter, I did so because I had no further ability to assert my own position. Ford totally controlled and dictated the terms.

Hyman's November 15, 1999 affidavit at ¶ 27.[8] Hyman also submitted the affidavits of Frances Hyman and John C. Conway, Jr. in support of his duress argument.

■ Under South Carolina law, duress has been defined as coercion that puts a person in such fear that he is "bereft" of the quality of mind essential to the making of a contract and the contract was thereby obtained as a result of this state of mind. *In re Nightingale's Estate,* 182 S.C. 527, 189 S.E. 890, 897 (1937); *Cherry v. Shelby Mut. Plate Glass & Cas. Co.,* 191 S.C. 177, 4 S.E.2d 123 (1939) (duress is defined as "a condition of the mind produced by improper external pressure of influence that practically destroys the free agency of a party and causes him to do an act or form a contract not of his own volition"); *Phillips v. Baker,* 284 S.C. 134, 325 S.E.2d 533 (1985). As noted in *Nightingale's Estate,*

The fear which makes it impossible for a person to exercise his own free will is not so much to be tested by the means employed to accomplish the act, as by the state of mind produced by the means invoked. If one of the parties to an agreement is in a position to dictate its terms to such an extent as to substitute his will for the will of the other party

thereto, it is not a mutual voluntary agreement, but becomes an agreement emanating entirely from his own mind.

*Id.* at 898. *See also* Restatement (Second) of Contracts 175(1) (1981) (if a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim).

The issue presented here is factually similar to one raised in *Brock v. Entre Computer Centers, Inc.,* 933 F.2d 1253, 1260 (4th Cir.1991). In *Brock,* the plaintiff entered into a franchise agreement with the defendant. In the franchise agreement, the parties agreed that the defendant would not unreasonably withhold his consent to a transfer of the franchise, but the transfer was conditioned upon the franchisee executing a release in a form satisfactory to franchisor. When plaintiff's business was unprofitable and he sought to sell his franchise, defendant insisted that the release—as provided for in the franchise agreements—be given or consent would be withheld. Eventually, plaintiff signed the consent, sold the franchises and then filed a lawsuit.

Plaintiff in *Brock* argued that the release was void because it was entered into under economic duress. In finding that plaintiff could not prove economic duress, the Fourth Circuit focused on the fact that plaintiff had expressly agreed in the franchise agreements, at a time when he was under no financial distress whatsoever, that he would not transfer the businesses without defendant's consent, and that defendant had the right to condition its consent on the execution of a general release in defendant's favor. At the time the original agreement was entered into, plaintiff

---

8. While the affidavit seems to assert a claim for "economic duress", at oral argument plaintiff's counsel disputes that the duress was economic. *See* Transcript at p. 24, ln. 14–21.

was under no duress or financial difficulty and was perfectly free to walk away from the deal. The plaintiff was under no obligation to enter into the agreement and he was free to negotiate if he did not want to be bound by the release provision. Since he did not, the Court found the releases were not procured through duress. Thus, the Court found Entre made no wrongful threat that destroyed the franchisees' free agency; it only required the franchisees to do what they already had agreed to do. *Id.* at 1260.

The facts in this case fit the factual scenario in *Brock*. Even accepting as true plaintiff's fear and duress, Hyman expressly agreed in 1991, when entering into the Agreement, that he would not be granted an inventory return unless he executed a General Release in Ford's favor. There are no allegations that in June 1991 Hyman was experiencing fear, was under financial difficulty or did not enter into the contract on his own free will. Hyman entered into the Agreement and agreed to the parts return privilege terms at a time when he was perfectly free to walk away from the deal.

Ford made no wrongful threat that destroyed Hyman's free agency; it merely required Hyman to do what he had already agreed to do in 1991. The only possible threat was that Ford promised to enforce its rights under the Agreement, i.e., not buy back the unused parts unless there was a General Release. As a result, the General Release which was provided for by the Agreement was not procured through duress—economic or any other kind. *See Brock*, 933 F.2d at 1260.[9]

Further, even considering all favorable inferences from the alleged facts in Hyman's favor, he still cannot establish he had no reasonable alternative but to sign the release, and that those circumstances were caused by Ford. Although it may not have been the most economical alternative, Hyman could have refused to sign the release, sold the inventory elsewhere and sued Ford for their alleged bad acts. Hyman's decision not to pursue this course of action was prompted by economic self-interest, not by any acts attributable to Ford.[10] It is established beyond peradventure that duress will not be implied from the making of a hard bargain or from a

9. The Court notes that Ford's requirement of granting parts return privileges only in exchange for a General Release has withstood judicial scrutiny in a number of cases. *See Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 893 (3rd Cir.1975) (rejecting argument that release was void because it was signed under duress, consisting of Ford's refusal to repurchase plaintiff's parts inventory unless the general release was executed); *Schmitt–Norton Ford, Inc. v. Ford Motor Co.*, 524 F.Supp. 1099, 1104 (D.Minn.1981) (rejecting argument that Ford coerced plaintiff into signing release by refusing to pay for returned parts until release was executed); *Grand Motors, Inc. v. Ford Motor Co.*, 564 F.Supp. 34, 41 (W.D.Mo.1982) *aff'd* 685 F.2d 438 (8th Cir.1982)(table)(rejecting argument that return of unused inventory was coercively preconditioned upon execution of the general release, finding, *inter alia*, that Ford had

the contractual right under the dealership agreement for the demand).

10. The facts show that Ford was willing to approve Hyman's parents as dealers even if the General Release was not granted. In response to Mr. and Mrs. Hyman's concerns about the delay in their approval as dealers they wrote to Ford indicating "Mr. Clarke Hyman, the outgoing Dealer has been advised by his counsel that he should not sign a General Release at this time." *See* December 29, 1995 letter. The January 2, 1996 response letter from Ford (Joe W. Sams) to Mr. and Mrs. Haywood Hyman clearly states "[Ford] will go forward with the Resignation letter only, but without the General Release you *will not* receive a parts return." (emphasis in original). Clearly, the only consequence to Hyman for not executing the General Release was not having the benefit of a parts return.

showing that a release was given under the press of adverse business conditions. *Three Rivers Motor Co. v. Ford Motor Co.*, 522 F.2d 885, 893 (3rd Cir.1975); *Grand Motors, Inc. v. Ford Motor Co.*, 564 F.Supp. 34, 41 (W.D.Mo.1982).

Finally, Hyman's assertions of duress are substantially undermined by the fact that he was represented by counsel throughout the termination of Agreement and the bankruptcy proceedings. This consultation occurred over a period of many months—the amount of time it took to terminate the dealership, receive bankruptcy approval and sell the assets. During this time, the record clearly reflects that the issue of the General Release was discussed and negotiated on among the parties and their attorneys. *See* Footnote 9. As noted in *Humana Kansas City, Inc. v. Continental Cas. Co.*, 1995 WL 669241 (W.D.Mo.1995), *aff'd*, 94 F.3d 648, 1996 WL 436993 (8th Cir.1996)(table), "duress will rarely exist when the parties are sophisticated and represented by counsel during negotiations." *See also House v. Aiken Co. National Bank*, 956 F.Supp. 1284 (D.S.C.1996), *aff'd*, 103 F.3d 118, 1996 WL 726801 (4th Cir.1996)(table) (access to an attorney supports finding a validity of release); *Resolution Trust Corp. v. Palmetto Fort of Mt. Pleasant*, 831 F.Supp. 510 (D.S.C.1993)(finding no duress when document was executed after consultation with attorney).

The record clearly reflects that the General Release is not voidable due to duress.

#### c. *Regulation of Manufacturers, Distributors and Dealers Act ("Dealers Act")*

Hyman argues that the General Release is void because it violates S.C.Code § 56–15–40(3)(k). This section of the Dealers Act states it is a violation of the Act "to required a motor vehicle dealer to assent to a release, assignment, novation, waiver or estoppel which would relieve any person from liability imposed by this chapter." Hyman further argues that any contract or part of a contract that is in violation of the Act is void and unenforceable. *See* S.C.Code § 56–15–15–130 ("Any contract or part thereof ... in violation of this chapter shall be deemed against public policy and shall be void and unenforceable.").

In *Toyota of Florence, Inc. v. Lynch*, 314 S.C. 257, 442 S.E.2d 611 (1994), the South Carolina Supreme Court addressed § 56–15–40(3)(k). The trial judge held that certain releases contained in the Dealer Agreement were void under the Act as a matter of law. The Supreme Court reversed, finding the trial court erred in holding any and all releases void under the Act because "the plain language of § 56–15–40(3)(k) invalidates a release *only if the dealer is required to assent to it.*" *Id.* at p. 616 (emphasis added).

Interpreting the statute in its plain and ordinary meaning shows that it is inapplicable to these facts. As noted above, Hyman was not "required" or coerced to enter into the General Release. He did so under his own volition, after consultation with his attorney. Further, he voluntarily entered into the Agreement with Ford in 1991 and agreed to the terms of the parts return privileges. *See Brock*, 933 F.2d at 1260. Because Ford did not require Hyman and WCM to execute the General Release, § 56–15–40(3)(k) does not affect the validity of the General Release.

#### d. *Approval by Bankruptcy Court of Release*

In opposing the motion to dismiss and in seeking partial summary judgment, Hyman argues that the General Release is invalid because it was not approved by the

bankruptcy court. Defendant asserts that the General Release was approved by the bankruptcy court.

First, Hyman has failed to cited to any authority showing that the bankruptcy court needed to approve the General Release.

Second, the facts show, indisputably, that the bankruptcy court did approve the General Release. The bankruptcy court's approval of the sale was conditioned on Ford's approval of Hyman's parents as the new dealer. *See* Order of Sale of Assets. As Ford communicated to Hyman in its January 2, 1996 letter, Ford was prepared to approve the transfer of the dealership to Hyman's parents and would do so without requiring the release. Nonetheless, as evidenced by Hyman's letter of resignation, dated January 9, 1996, he elected to execute the General Release and obtain the benefit of the parts return. The bankruptcy court expressly approved of Hyman's letter of resignation in its Consent Order Authorizing Rejection of Dealer Agreements and Resignation, dated March 15, 1996. This letter expressly released Ford from liability in exchange for the parts return privilege, which WCM assigned to his parents. While Hyman asserts that the resignation letter "expressly indicates that the Release was *required,* not voluntarily given," (*see* Hyman Affidavit at ¶ 23), the term "requirement" is used out of context. As expressly stated in the Agreement, the General Release was only required if a part return was sought by the dealer.

Further, in this same Order, the bankruptcy court approved the termination of WCM's Agreement with Ford and WCM's resignation as a Lincoln–Mercury dealer "in accordance with the terms of the Agreements." *Id.* The terms of the Agreement specifically provide that upon termination by the dealer, the dealer can elect for Ford to repurchase unwanted parts upon the execution of a General Release. *See* Agreement at ¶ 21, 23. Thus, the bankruptcy court approved the resignation in accordance with the terms of the Agreement, including the release in exchange for a parts return privilege.

Hyman has failed to raise an issue of fact as to the need for and the failure of the bankruptcy court's approval of the General Release. Thus, this argument does not defeat Ford's summary judgment motion and Hyman's motion for partial summary judgement is denied.

### e. *Restoration of Consideration*

Ford asserts that Hyman's claim to void the release should be dismissed because Hyman failed to return the $190,153.27 that Ford paid as consideration for the release.

■■■ The general rule in South Carolina is that when a party seeks to set aside a release, he must first return any consideration received by him for the release. *Gray v. Petoseed Co.,* 1997 WL 716454, 129 F.3d 1259 (4th Cir.1997) (table) (affirming dismissal of fraud because under South Carolina law when a party to a compromise settlement wishes to avoid a valid release and be restored to his original rights, he must restore the other party to his original position by returning or offering to return the consideration received under the compromise); *McCarty v. Kendall Co.,* 242 F.Supp. 495 (W.D.S.C.1965)(action to avoid a release allegedly induced by fraud dismissed due to plaintiff's failure to return or tender consideration given for settlement); *Dunaway v. United Ins. Co. of America,* 239 S.C. 407, 123 S.E.2d 353, 354 (1962) (failure to tender or return consideration given for settlement precluded recovery in action for fraudulent inducement of settlement);

*State Farm Mut. Auto. Ins. Co. v. Turner*, 303 S.C. 99, 399 S.E.2d 22, 23 (1990)("it is well settled that one who seeks to avoid the effects of a release must first return or tender consideration paid thereof").

■ Plaintiff does not contest that there has been no return or offer to return the consideration such that would entitle Hyman to treat the contract of release as rescinded. Hyman insists upon retaining the benefits which he received under the contract releasing Ford from liability, and, at the same time, insists upon escaping the obligations imposed by the release. Thus, the condition precedent to avoiding the release, viz. the return or tender of consideration for the release, has not been complied with. Hyman knew of the "duress" at the time he signed the release, but he did not raise the issue for over three years. In this situation, Hyman has clearly waived his right to avoid the release on claims of duress and has affirmed the release. *See Brown v. Walker Lumber Co.*, 128 S.C. 161, 122 S.E. 670, 671–672 (1924).

■ Moreover, the doctrine of ratification precludes Hyman from avoiding the effects of the release even if it was induced under duress, without the approval of the bankruptcy court or in violation of the Dealer's Act. A contract or release which is procured by duress is not void, but merely voidable and is capable of being ratified. And the person claiming duress must act promptly to repudiate the contract or release, or he will be deemed to have waived his right to do so. It is a well-established proposition that a voidable contract may be ratified by a party's failure to act promptly to repudiate the contract. *See O'Shea v. Commercial Credit Corp.*, 930 F.2d 358, 361 (4th Cir.1991)(recognizing possibility of ratification of an invalid release); *In re Boston Shipyard Corp.*, 886 F.2d 451, 455 (1st Cir.1989) ("it is well-settled ... that a contract or release, the execution of which is induced by duress, is voidable, not void, and the person claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so"); *Anselmo v. Manufacturers Life Ins. Co.*, 771 F.2d 417, 420 (8th Cir.1985) (plaintiff signed a release under threat of losing severance pay, then sued to rescind, claiming duress, and court held for defendant on ground that employee accepted and thereby ratified the contract).

■ A party may ratify an agreement entered into under duress in a number of different ways: by intentionally accepting benefits under the contract; by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it; or by recognizing its validity by acting upon it, performing under it or affirmatively acknowledging it. *In Re Boston*, 886 F.2d at 455. Thus, one seeking to repudiate an agreement allegedly entered into under duress must promptly complain of the circumstances under which the document was signed. *Id.; See also* Annotation, *Ratification of Contract Voidable for Duress*, 77 A.L.R.2d 426, 1961 WL 12928 (1961).[11]

---

11. Other state and federal courts have rejected claims for recission where parties waited too long to assert their rights. *See e.g. Grillet v. Sears, Roebuck & Co.*, 927 F.2d 217, 221 (5th Cir.1991)(2½ year delay in repudiating release unreasonable); *Baker v. Penn Mutual Life Ins. Co.*, 788 F.2d 650, 662 (10th Cir. 1986)(claim for recission brought 8 years after contract was effective untimely); *Mariner Water Renaturalizer v. Aqua Purification Systems, Inc.*, 665 F.2d 1066 (D.C.Cir.1981)(time lapse of 5–8 weeks between buyer's discovery of grounds for recission of contract and buyer's notification of seller was not reasonable for purposes of election to rescind); *Steinberg v. Bay Terrace Apt. Hotel, Inc.*, 375 So.2d 1089

Hyman executed the release on March 19, 1996. He has waited over three years to raise his claim of duress or illegality of the release. The undisputed facts indicate that Hyman ratified the release by retaining the benefits of the release for over three years. Hyman seeks to have it both ways—to retain the benefits of the buy back privilege and to sue Ford—and that is something which this court cannot allow.

## CONCLUSION

There are no genuine issues of material fact as to any of the claims raised to invalidate the General Release executed by plaintiff in 1996. The General Release is valid and enforceable, and therefore, this action is barred.

Therefore, it is hereby

**ORDERED** that Hyman's motion for partial summary judgment is **DENIED;** and

**FURTHER ORDERED** that Ford's motion to dismiss is **GRANTED** and this action is **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**

(Fla. 3d DCA 1979)(remedy of recission disfavored when complaining party fails to promptly deny the contract as binding on him and fails to follow a course of conduct manifesting disavowal of it).