# United States Court of Appeals

## For the First Circuit

No. 01-2049

ROCHESTER FORD SALES, INC.,

Plaintiff, Appellant,

v.

FORD MOTOR COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Boudin, Chief Judge,

Lynch, Circuit Judge,

and Gertner,[*] District Judge.

Daniel A. Laufer was on brief for appellant.
Nicholas T. Christakos, with whom Brian M. Haynes and
Sutherland Asbill & Brennan LLP, were on brief for appellee.

April 24, 2002

---

[*]Of the District of Massachusetts, sitting by designation.

**GERTNER**, **District Judge**. This case asks us to construe the validity of a general release provision in a sales and service (i.e., dealership) agreement between an automobile manufacturer and its licensed dealer. In December 1999, plaintiff-appellant Rochester Ford Sales ("RFS"), a Ford dealership, sued defendant-appellee Ford Motor Co. ("Ford"), claiming, inter alia, that Ford's refusal to approve another licensed dealer's offer to purchase RFS's assets and dealership rights in 1995 violated N.H. Rev. Stat. Ann. § 357-C:3:I ("§ 357-C"). The statute provides:

> It shall be deemed an unfair method of competition and unfair and deceptive practice for any [m]anufacturer, factory branch, factory representative, distributor, distributor branch, distributor representative or motor vehicle dealer to engage in any action which is arbitrary, in bad faith, or unconscionable and which causes damage to any of such parties or to the public.

In response, Ford argued that any claims RFS may have had under § 357-C were barred by a general release RFS executed vis-à-vis Ford when it exercised certain options under Ford's Sales and Service Agreement ("Agreement"). In 1998, Ford approved the sale of RFS's dealership assets to Granite State Ford, LLC ("Granite Ford"). When RFS elected to have Ford repurchase certain Ford products in order to facilitate the sale, it also executed a release of all claims against Ford.

In December 2000, Ford moved for summary judgment on the release issue. The district court[1] granted Ford's motion in June

---

[1] The case was before the federal district court on diversity grounds, pursuant to 28 U.S.C. § 1332(a).

2001. <u>Rochester Ford Sales, Inc.</u> v. <u>Ford Motor Co.</u>, No. Civ. 99-559-M, 2001 WL 799594 (D.N.H. June 21, 2001). The district court found that the terms of the general release in question were both valid and binding on RFS, rejecting RFS's arguments that the release was supported by insufficient consideration and/or that it was the product of coercion.

RFS now raises two issues on appeal: (1) the validity of the release and (2) assuming the release is not valid, whether RFS presented sufficient evidence to warrant a jury trial on the § 357-C claim. We hereby **AFFIRM** the decision of the district court in all respects.

## I.  <u>BACKGROUND</u>

### A.  <u>Factual Background</u>

As the law requires, we construe the facts of this case in the light most favorable to RFS, the nonmoving party. <u>Houlton Citizens' Coalition</u> v. <u>Town of Houlton</u>, 175 F.3d 178, 184 (1st Cir. 1999). As the district court observed, the parties agree regarding many basic facts, although RFS would have us draw inferences from some of those facts that even the lenient summary judgment standard cannot support.

RFS first entered into a Sales and Service Agreement with Ford in 1980. After the dealer principal, James Peirce, died in 1994, his widow Meredith S. Peirce became its sole owner. In 1996, she executed a new Sales and Service Agreement with Ford, which the

parties agree was identical to the first in all relevant respects. The Agreement itself is an extensive document, addressing in detail the procedures for running and selling a dealership. For the present purposes, several provisions are relevant.

First, with regard to a prospective sale of the dealership, Paragraph 24(a)(2) gives Ford the right to approve or decline to approve a prospective purchaser. It provides, in relevant part:

> [Ford] has the right to approve or decline to approve any prospective purchaser as to his character, automotive experience, management, capital and other qualifications for appointment as an authorized dealer in company products for the dealership operations involved. Approval . . . of the prospective purchaser shall not, however, be unreasonably withheld.

Second, to facilitate the orderly transfer of ownership, a number of provisions address the right of the Dealer to demand the repurchase of Ford products by Ford at the time of the dealership sale and to assign such rights to the successor dealer. Paragraph 21 describes the right of the Dealer to demand that the company repurchase certain parts in connection with the Dealer's notice of termination or nonrenewal, as follows:

> Upon . . . termination or nonrenewal of this agreement by the Dealer, the Dealer may demand in his notice of termination or nonrenewal, to have the Company purchase or accept upon return from the Dealer, in return for his general release specified in paragraph 23 [certain vehicles, parts, dealer's signs, special tools and equipment as outlined in paragraphs 21(a)-(d)].

-4-

The Dealer could not only demand Ford's repurchase of parts, but could also assign its repurchase rights to a successor Dealer.

> Assignment of Benefits. As an assist to the Dealer in effecting an orderly transfer of his assets to a replacement dealer and to minimize possible interruptions in customer convenience and service, in the event of termination or nonrenewal by either party, any rights or benefits with respect to subparagraphs 21(a), 21(b), 21(c), and 21(d), herein may be assigned by the Dealer to anyone whom the Dealer has agreed to sell the respective property and whom [Ford] has approved as a replacement for the Dealer. Such assignments will be subject to Dealer's fulfillment of his obligations under paragraph 19 and this paragraph 21 and subject to the Dealer's tender of a general release as specified in paragraph 23.

Both of these provisions -- the Dealer's right to have Ford repurchase parts and the Dealer's right to assign its repurchase rights to the successor dealer -- required the execution of a general release between the Dealer and Ford. Paragraph 23 provides, in relevant part, as follows:

> [U]pon the Dealer's demand of any of [the benefits provided for in paragraph 21] upon any termination or nonrenewal by the Dealer, [Ford] shall be released from any and all other liability to the Dealer with respect to all relationships and actions between the Dealer and [Ford], however claimed to arise . . . . Simultaneously with the receipt of any benefits so elected or demanded, the Dealer shall execute and deliver to [Ford] a general release with exceptions, as above described, satisfactory to [Ford].

Negotiations to sell RFS, which was not doing well financially, began in 1994. The dealership proved to be difficult to sell because the real estate on which it was situated was a

-5-

former municipal dump and contaminated by solid waste.  Over the next three years, during which RFS lost almost $700,000, four or five different prospective sales fell through for various reasons, including, in 1995, Ford's refusal to approve one of the sales.  In December 1995, RFS sought Ford's approval of a proposed sale of its Ford dealership to Rochester Lincoln Mercury, Inc. ("RLM").  Ford refused its consent on the grounds that RLM's track record in sales was too weak; RFS's owners were disappointed, but continued to search for a buyer.

On January 23, 1998, RFS finally executed an agreement to sell the Ford dealership to Dennis Roberts and Kevin Donovan, owners of Granite Ford.  RFS tendered the asset purchase agreement to Ford on January 26, 1998.  Then, in order to facilitate the transfer, RFS took the following three steps on March 4, 1998:

(1) RFS voluntarily terminated its Sales & Service Agreement with Ford by signing and tendering a letter of resignation drafted by Ford.  The letter stated that RFS's resignation would be effective when accepted by Ford Motor Company, "expressly conditioned upon the successful closing of the pending Purchase and Sale Agreement between Peirce Ford Sales and Dennis Roberts, Kevin Donovan, and/or Granite Ford."

(2) In the letter, RFS explicitly elected the parts repurchase option available under paragraph 21 of the Sales and Service Agreement.  RFS requested that Ford repurchase its inventory of new, unused, and undamaged eligible Ford parts and accessories "upon terms and conditions set forth in subparagraph 21(b) . . . in

-6-

an amount by which the actual audited inventory exceeds recommended inventory guide levels as determined by Ford Motor Company in its sole discretion." Having elected the repurchase option, RFS then assigned it to Granite Ford under paragraph 21(g), pursuant to the Ford asset sale agreement.

(3) RFS executed and delivered a written general release in favor of Ford, in exchange for the parts buyback option and right of assignment, as specified in the Ford Sales & Service Agreement.

At some point between January and March 1998, Ford approved the sale of RFS to Granite Ford; the precise date is unclear from the record. On February 24, 1998, Ford sent RFS a packet of sample forms to be used in effectuating its resignation "to assist you in the buy-sell agreement with Dennis Roberts." Moreover, William Albee (the son of Mrs. Peirce, the owner of RFS) stated in his affidavit in support of the plaintiff's opposition to summary judgment that "on February 25, 1998 prior to closing, J.H. Friestedt on behalf of Ford Motor Company had already approved the purchase [of] the dealership by Roberts and Donovan through Granite Ford, LLC." However, Friestedt's memorandum recommending approval of the sale is dated March 12, 1998.

The sale to Granite Ford closed on April 1, 1998. After closing the sale, and notwithstanding the release it had signed, RFS brought this suit against Ford, alleging that Ford unreasonably withheld its consent to the proposed RLM sale in 1995, resulting in a substantial financial loss to RFS, in violation of N.H. Rev. Stat. Ann. § 357-C:3. Ford responded that RFS's suit was barred by the

terms of the general release executed on March 4, 1998, pursuant to paragraphs 21 and 23 of the Sales and Service Agreement.

### B. Decision Below

The district court found the core question on summary judgment to be a straightforward one: Is RFS bound by the terms of its general release?[2]  RFS had argued that the release was not binding for two reasons: (1) it was not supported by adequate consideration; and (2) it was coerced or the product of duress.  The district court found both claims to be insufficiently supported by evidence to survive summary judgment.

As to the consideration question, the district court explained that the Dealership Agreement "very clearly provided [RFS] with an option relative to parts repurchase upon its voluntary termination of the dealership agreement: (1) it could either elect to put the eligible parts back to Ford (or assign that right to its purchaser), in exchange for a general release of all claims against Ford . . . ; or (2) it could elect to keep the parts and/or sell them to others, giving no release to Ford, and retaining the right to sue Ford on any claims [RFS] might have."  2001 WL 799594, at *2. The consideration given by Ford was the agreement to buy back the eligible parts, or assign them, at RFS's option. The court found that this was sufficient consideration.  See Hyman v. Ford Motor

---

[2] Note that this case concerns only the release of claims that arose prior to the 1998 sale to Granite Ford.  It does not address the question of releases of any claims arising out of the sales transaction itself.

-8-

<u>Co.</u>, 142 F. Supp. 2d 735 (D.S.C. 2001); <u>Grand Motors, Inc.</u> v. <u>Ford Motor Co.</u>, 564 F. Supp. 34, 39-40 (W.D. Mo. 1982).[3]

As to the coercion claim, the district court noted that, once RFS voluntarily terminated its dealership agreement and elected the repurchase option, Ford was effectively and automatically released under paragraph 23 of the Service and Sales Agreement. The subsequent written release "served merely to memorialize" what the terms of the agreement made automatic. 2001 WL 799594, at *4.

Thus, the district court concluded, any claim that the release <u>form</u> was coerced was of no moment; Ford had already been released under the Agreement when RFS made its written demand for repurchase in its voluntary notice of termination. Moreover, the court found no other evidence of coercion in the record; RFS may have later regretted taking the repurchase option in exchange for releasing Ford from further liability, but its choice to do so was nonetheless voluntary and uncoerced. 2001 WL 799594, at *5. Finding no genuine issues of material fact to warrant a trial, the court granted summary judgment to Ford.

---

[3] RFS countered that the consideration was inadequate because the buyback option was an illusory promise, since New Hampshire law independently required Ford to buy back the parts on the termination of the dealership agreement. However, the court found that the statute in question, N.H. Rev. Stat. Ann. § 357-C:7:VI(b), by its plain language only applied to "involuntary termination or nonrenewal <u>by the manufacturer</u>, not voluntary termination by the dealer, as was the case here." 2001 WL 799594, at *3. Accordingly, the court found this argument, too, to be without merit.

## II.  DISCUSSION

### A.  Standard of Review

This Court reviews grants of summary judgment de novo, construing the record in the light most favorable to the nonmovant and resolving all reasonable inferences in that party's favor. Houlton Citizens' Coalition, 175 F.3d at 184. This standard of review does not limit us to the district court's rationale; we may affirm the entry of summary judgment on "any ground revealed by the record." Id.

Summary judgment may be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). To be considered material, a disputed fact must have the potential to "affect the outcome of the suit under the governing law." Id. at 248.

The party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden "may be discharged by 'showing' -- that is, pointing out

to the district court -- that there is an absence of evidence to support the nonmoving party's case." Id. at 325. After such a showing, the "burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (citing Celotex, 477 U.S. at 322-25).

In the end, after examining the facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, we are required to determine if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249.

### B. Consideration

RFS argued before the district court that the buyback option per se did not constitute valid consideration for the release. On appeal, RFS makes a different argument: that Ford failed to give the consideration it was supposed to give RFS because it varied the description of the parts eligible for return between the original description in the Sales and Service Agreement and that in the letter containing RFS's election of the repurchase option (a letter that Ford drafted, but RFS signed).

According to RFS, paragraph 21(b) of the Sales & Service Agreement entitles a dealer to request Ford to repurchase all current unused Ford parts in the dealer's inventory. However, the March 4, 1998 letter of resignation drafted by Ford requested that

-11-

Ford accept the return of such current unused parts as exceed recommended inventory guide levels. Thus, RFS argues, in so drafting the letter, "Ford unilaterally reduced the number of current unused parts that were covered by the buyback."

RFS maintains that the fact that it did not actually receive the bargained-for consideration distinguishes the present case from all the other cases upholding Ford's release provisions. See, e.g., DeValk Lincoln Mercury, Inc. v. Ford Motor Co., 811 F.2d 326, 329 (7th Cir. 1987); Fabert Motors, Inc. v. Ford Motor Co., 355 F.2d 888, 890 (7th Cir. 1966); Hyman, 142 F. Supp. 2d at 741; Ray Dobbins Lincoln-Mercury, Inc. v. Ford Motor Co., No. 83-M-10-R, slip op. (W.D. Va. Aug. 16, 1984), aff'd, 813 F.2d 402 (4th Cir. 1985); Grand Motors, 564 F. Supp. at 39; Schmitt-Norton Ford, Inc. v. Ford Motor Co., 524 F. Supp. 1099, 1103 (D. Minn. 1981). Accordingly, RFS argues, the release must be held invalid for lack of consideration, and the case should have been allowed to proceed to trial.

Ford responds that RFS received adequate consideration for the release when it exercised the buyback option and assigned the parts repurchase right to Granite Ford. The repurchase right is expressly listed as one of the dealership assets to be sold under the asset purchase agreement between RFS and Granite Ford. Ford argues that the consideration that RFS received in terms of the purchase price it negotiated with Granite Ford satisfies the requirement of consideration. See Hyman, 142 F. Supp. 2d at 742 (under similar circumstances, finding consideration where seller

-12-

assigned repurchase right to replacement dealer; the fact that the seller was not the one to personally receive the parts return is irrelevant). As to the variation in terms, Ford acknowledges that the letter of March 4, 1998 contains a more stringent limitation of the parts repurchase than the one in the Dealership Agreement, but argues that it is the Agreement and Rochester Ford's written release that actually govern the terms of the parts repurchase, and thus that it is bound to accept return of all current parts in any case.

We find that the district court's reasoning on the consideration issue was very much on point: RFS obtained the benefit of the repurchase option in Paragraph 21, which it expressly included as an asset of the dealership to be sold to Granite Ford, in exchange for releasing Ford from liability. Ford's agreement to repurchase the parts in question either from RFS or from RFS's assignee was sufficient to support the general release obligation; whether it was RFS or the assignee who would actually receive the money in exchange for the parts is irrelevant to the consideration issue. See Hyman, 142 F. Supp. 2d at 742.

Finally, RFS makes an additional argument -- that no consideration for the release ever materialized because Ford never actually repurchased any parts from Granite Ford. This argument, too, is without merit. For the purposes of analyzing whether RFS received consideration in exchange for the release, the transaction that concerns us is RFS's exercise of the repurchase option and the sale of that option, among RFS's assets, to Granite Ford, not any subsequent transactions between Ford and Granite Ford, to which RFS

-13-

is not a party.  We therefore agree with the district court that the release here was supported by valid consideration.

## C. **Coercion**

Apart from formal challenges to the release and the consideration underlying it, RFS's core argument is that the release was coerced.  It claims that the district court failed to recognize that what appeared to be an arm's-length transaction between consenting parties was in reality an extensive scheme by Ford to profit from RFS's dire financial straits -- a scheme that began in 1995 with Ford's unreasonable refusal to approve the RLM sale and continued through the final sale of RFS to Granite Ford.  RFS focuses on two main issues: (1) the fact that the Agreement makes the release a prerequisite to Ford's consideration of the proposed sale and (2) Ford's behind-the-scenes conduct in orchestrating the transaction.

### 1.  **The Release**

Looking at the timing of the release, RFS notes that, according to the trial court's interpretation of the agreement (with which Appellee Ford agrees[4]), the release became effective on March

---

[4] As Ford points out, other courts to consider the issue have also interpreted it in this way: An election of benefits under paragraph 21 automatically triggers the general release of paragraph 23.  See Ray Dobbins Lincoln-Mercury, slip op. at 6-7; DeValk Lincoln Mercury, 811 F.2d at 331 ("Paragraph 23 is unambiguous.  It plainly states that when the dealer, DLM, demands the benefits of returning inventory, 'the Company shall be released from any and all other liability to the Dealer.'  We can scarcely conceive of a more clearly written release of liability.  The subsequent requirement for a written document simply allows the parties to memorialize an automatic release already in effect.").

-14-

4, 1998, when RFS executed the letter demanding the parts buyback option. At this point, according to RFS, the Granite Ford deal was not yet complete; Ford had not yet given its final approval to the sale. Thus, RFS argues that it was required to release all claims against Ford "as a condition of Ford even considering the proposed sale of the RFS dealership to Granite Ford," not just in exchange for the buyback option itself.

Accordingly, RFS maintains that a jury could find that making the release a prerequisite to Ford's consideration of the proposed sale violates Michigan law (which both parties agree governs this Agreement), and, as such, that Ford's requiring the release is an unfair and deceptive practice under N.H. Rev. Stat. Ann. 357-C:3:I. Michigan law, Mich. Comp. Laws Ann. § 445.1573(h), prohibits auto manufacturers from prospectively assenting to a release, assignment, novation, waiver, or estoppel that would relieve any person from liability imposed by the statute. Ford responds that the release in the Dealership Agreement satisfies all of the legal requirements for an enforceable release.

Because Michigan courts presume the validity of releases, RFS bears the burden of demonstrating that the release is invalid. Stefanac v. Cranbrook Educ. Cmty., 435 Mich. 155, 163-64 (1990). Michigan law requires that a valid release must be "fairly and knowingly made." Brusseau v. Elec. Data Sys. Corp., 694 F. Supp. 331, 334 (E.D. Mich. 1988); Skotak v. Vic Tanny Int'l, 203 Mich. App. 616, 618 (1994). Releases are only invalid where "(1) the releasor was dazed, in shock, or under the influence of drugs, (2)

-15-

the nature of the instrument was misrepresented, or (3) there was other fraudulent or overreaching conduct." Skotak, 203 Mich. App. at 618. It is a prerequisite that the releasor must tender the consideration received before filing suit and repudiating the release. Stefanac, 435 Mich. at 173-74.

Plainly, there is no evidence that RFS was in any way limited in its capacity at the time it executed the original agreement, or that it was mistaken as to the nature of the Agreement. See Hyman, 142 F. Supp. 2d at 744 (paragraph 23 release mechanism not coercive absent evidence of coercion in connection with original Sales and Service Agreement); see also, e.g., DeValk Lincoln Mercury, 811 F.2d at 333 (rejecting claim that automatic release provision was either unconscionable or unreasonable); Schmitt-Norton Ford, 524 F. Supp. at 1103-04 (granting Ford's motion for summary judgment on grounds that release was supported by valid consideration in form of repurchase option and finding no economic coercion); Grand Motors, 564 F. Supp. at 39 (same); Fabert Motors, 355 F.2d at 888 (same).

None of the statutory provisions to which RFS points bars the release provision here. Mich. Comp. Laws § 445.1573(W)(h) bars manufacturers from requiring dealers to "prospectively assent to a release . . . which would relieve any person from liability imposed by this act." (Emphasis added.) Not only does the statute provide, on its face, that it does not apply to dealers located outside the state of Michigan, Mich. Comp. Laws § 445.1582, but the release at issue here is not "prospective": It releases Ford from all claims

-16-

"by reason of anything whatsoever occurring <u>prior to the date of these presents</u>." (Emphasis added.) In other words, a prospective release is one that would relieve the releasee of all liability for anything s/he does in the future <u>after</u> the release is signed; this is the type of release proscribed by the Michigan statute. Accordingly, because RFS has failed to adduce any evidence that the release in question is, on its face, barred by Michigan statute,[5] we find that nothing about the release itself entitled RFS to a jury trial on the question of whether the release violated N.H. Rev. Stat. Ann. 357-C:3:I.

## 2. **Ford's Conduct**

As to Ford's conduct behind the scenes, RFS maintains that the district court erred in ignoring substantial evidence of coercion by Ford in obtaining RFS's "voluntary" termination and release.[6] RFS argues that Ford, knowing that RFS was on its last

---

[5] Likewise, N.H. Rev. Stat. Ann. § 357-C:3:III(m), which RFS also cites, proscribes manufacturer imposition of <u>mandatory</u> releases of liability. The Sales and Service Agreement does not <u>mandate</u> the release in question; rather, it makes the release voluntary, in exchange for the dealer's election of the repurchase benefit in paragraph 21. As the district court pointed out, RFS was absolutely free to refuse the repurchase and assignment option and retain its right to sue Ford; if choosing this path would have impacted the Granite Ford sale negatively, this was a result of how RFS and Granite Ford structured that sale, not of Ford's actions.

[6] There is some question here as to whether New Hampshire or Michigan law should govern the coercion issue. On the one hand, as the parties agree, paragraph 32 of the Sales and Service Agreement explicitly provides that "[t]he parties intend this agreement to be executed as a Michigan Agreement and to be construed in accordance with the laws of the State of Michigan." On the other, the issue of whether the release was coerced by Ford arguably does not arise within the four corners of the contract, and thus could be governed

legs financially, refused to allow the sale to RLM back in 1995, forced RFS to exercise the buyback option in 1998 by allegedly telling it that Ford would not go forward with the approval of the Granite Ford sale unless RFS executed the letter of termination and the release,[7] and underwrote $325,000 of the capital requirement of the Granite Ford dealership, giving Ford leverage to require that Granite Ford insist on including the buyback in the asset sale. Since RFS had no choice but to "opt" for the buyback option, it also had no choice but to sign the release that ostensibly eliminated its rights to sue for Ford's failure to approve the earlier 1995 sale.

---

by New Hampshire's choice of law rules; see, e.g., Benoit v. Test Sys., Inc., 142 N.H. 47, 52 (1997) (five-factor test under New Hampshire law for determining choice of law); Clark v. Clark, 107 N.H. 351, 353-55 (1966).

For the present purposes, however, this is an issue that we need not decide. Although the respective legal standards are articulated differently, they are similar in substance, and RFS's claim fails under either. Compare, e.g., Abbadessa v. Moore Business Forms, Inc., 987 F.2d 18, 23 (1st Cir. 1993) (setting out four-part test under New Hampshire law of (1) involuntary acceptance of terms of another where consent would not otherwise have been given; (2) coercion resulting from acts of opposite party; (3) pressure must be wrongful; and (4) circumstances permitted no alternative but to accept the terms of another), with Enzymes of America, Inc. v. Deloitte, Haskins & Sells, 207 Mich. App. 28, 35 (1994) (plaintiffs claiming duress must establish that they were illegally compelled or coerced to act by fear of serious injury to their persons, reputations, or fortunes; fear of financial ruin alone is insufficient), and Hungerman v. McCord Gasket Corp., 189 Mich. App. 675, 677 (1991).

[7] Ford's Boston Regional Sales Manager testified in his deposition that Ford would have proceeded without a release. RFS responds that this somehow raises "[t]he clear inference that Ford treated RFS in a different manner than other dealers," because "[i]f it was Ford's practice not to require the release then why did Ford insist on the release in this case?" Appellant's Brief at 14. We agree with Ford that this inference is unwarranted.

Ford responds that any constraints operating on RFS to execute the separate release resulted entirely from RFS's own actions in structuring the sale of the dealership to Granite. The asset purchase agreement between RFS and Granite sold Granite the buyback option as an asset of the dealership.[8] Granite would have been within its rights to withdraw from the sale if RFS did not provide that option. Thus, insofar as RFS was in any way required to sign the release, Ford maintains that this was the direct result of RFS's promise to Granite, not a requirement imposed by Ford. See Schmitt-Norton Ford, 524 F. Supp. at 1104 (finding that "[e]ven assuming that at the time they signed the release [the plaintiffs] had no alternative, this came about because of the way they structured the sale . . . , not because of Ford's actions").

Moreover, Ford points out that Chip Albee, RFS's Rule 30(b)(6) corporate designee, admitted in his deposition that RFS signed the release because he had concluded that the release was unenforceable, not because of any coercion by Ford; Albee later made the same statement in paragraph 28 of his affidavit attached to the plaintiff's opposition to summary judgment. It is a well settled point of law that signing a valid release in the belief that it is unenforceable nonetheless creates a binding release. See, e.g., Fortino v. Quasar Co., 950 F.2d 389, 395 (7th Cir. 1991); Runyan v. Nat'l Cash Register Corp., 787 F.2d 1039, 1044

---

[8] RFS's inventory of returnable parts and accessories was also included, separately from the buyback option, in the assets sold to Granite Ford.

(8th Cir. 1986); Smith v. City of Flint Sch. Dist., 80 Mich. App. 630, 633 (1978).

As to RFS's claim that the asset purchase agreement and the assignation of RFS's termination benefits to Granite Ford were somehow a "sham," Ford maintains that RFS has no evidence to suggest that Ford is accountable for the agreement between RFS and Granite Ford. More generally, Ford argues that RFS has failed to articulate any clear account of how Ford's relationship with Granite Ford in any way has an effect on the validity of RFS's release and the Ford-RFS agreement.

We agree with Ford. Although RFS has advanced several theories of how Ford's actions may have constrained it to opt for the repurchase option and sign the general release, it has not substantiated these theories with sufficient evidence to raise a triable coercion or duress claim to invalidate the release. At a minimum, a claim of coercion or duress requires that the alleged pressure result from the other party's conduct, not from other factors, and that the wrongful pressure occurred in sufficient measure to overwhelm the coerced party's independent judgment.

Here, RFS's claims of coercion all founder on a core point: the causation requirement, i.e., proving that the constraints on its options result from the defendant's conduct. Insofar as RFS claims that Ford's knowledge of its shaky financial status renders the release provision coercive, it is axiomatic that one party's dire financial straits alone are insufficient to

invalidate a contract on grounds of duress or economic coercion.[9]
See, e.g., French v. Shoemaker, 81 U.S. (14 Wall.) 314, 332 (1871)
("straitened circumstances" insufficient to negate voluntariness
of consent); Selmer Co. v. Blakeslee-Midwest Co., 704 F.2d 924,
928 (7th Cir. 1983) (Posner, J.) ("The mere stress of business
conditions will not constitute duress where the defendant was not
responsible for the conditions."); Mobility Sys. & Equip. Co. v.
United States, 51 Fed. Cl. 233, 237 (2001) (same).  In any case,
there is no indication in the record that RFS was in any such
straits when it originally entered into the Sales and Service
Agreement, which contained the option provisions, with Ford in
1980.

Moreover, the record does not reflect that RFS's
financial status per se drove it to opt for the repurchase
provision in 1998.  Rather, as already discussed above, RFS needed
or wanted to include the repurchase right as an asset in the sale
to Granite Ford, based on the agreed-to terms of that sale.
Insofar as RFS now alleges that Ford was the invisible hand on the
scales of those negotiations, these allegations are totally
unsubstantiated in the record.  The fact that Ford provided
substantial financing to Granite Ford, standing alone, does not in
any way suggest that Ford forced Granite Ford to insist on the

_____

[9] The same rationale applies to RFS's claim that Ford
unreasonably withheld its consent to the RLM deal.  Here, again,
the sole evidence advanced by RFS is Ford's knowledge of RFS's
financial circumstances, plus an unsubstantiated suggestion of
Ford's desire to destroy RFS financially.

-21-

repurchase option as a way of tightening the screws on RFS.  RFS's allegations and speculation here fall far short of carrying its burden to survive summary judgment.

**III.**  **CONCLUSION**

The judgment of the district court is **AFFIRMED.**